07-1320-cr
United States v. Wilson

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: November 5, 2009     Decided: June 30, 2010)

Docket No. 07-1320-cr

- - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

Appellee,

- v.-

MICHAEL WHITTEN, PARIS BULLOCK, ANGEL
RODRIGUEZ, also known as Ice, JAMAL BROWN,     07-1320-cr
also known as Mal,

Defendants,

RONELL WILSON, also known as Rated R,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - -x

Before:      JACOBS, Chief Judge, MINER, and
LIVINGSTON, Circuit Judges.

Ronell Wilson murdered two undercover police detectives

who were posing as gun buyers.  Wilson appeals from a

judgment of conviction and a sentence of death entered on

March 29, 2007, in the United States District Court for the

Eastern District of New York (Garaufis, J.).  Wilson appeals on twelve grounds (some with subparts), among them that: the evidence was insufficient to support a finding under the Violent Crimes in Aid of Racketeering statute, 18 U.S.C. § 1959, that Wilson acted to maintain or increase his position in a racketeering enterprise; and the district court abused its discretion in cutting off recross-examination that had bearing on whether Wilson shot in perceived self-defense because he thought his victims were about to rob him.  We affirm as to those claims and therefore affirm the convictions.

We likewise affirm the district court's rejection of Wilson's arguments that: voir dire was unfairly biased and constitutionally inadequate; testimony in the penalty phase exceeded what is permissible under the Constitution and the Federal Death Penalty Act, and required an additional corrective charge; and a fellow inmate was acting as a government agent in eliciting admissions from Wilson.

However, we vacate the death sentences, and remand, because two arguments made to the jury by the prosecution-- both bearing on the critical issues of remorse, acceptance of responsibility, and future dangerousness--impaired

Wilson's constitutional rights.  The government argued: [i] that Wilson put the government to its proof of guilt rather than plead guilty; and [ii] that Wilson's allocution of remorse should be discredited because he failed to testify notwithstanding the fact that "[t]he path for that witness stand has never been blocked for Mr. Wilson."  As to the first argument, although a guilty plea may properly be considered to support a sentence mitigation for acceptance of responsibility, the Sixth Amendment is violated when failure to plead guilty is treated as an aggravating circumstance.  As to the second, it is a fair argument for the prosecution to say that an allocution of remorse is unsworn and uncrossed, but the Fifth Amendment is violated when the defendant is denied a charge that limits the Fifth Amendment waiver to that which is said in the allocution and the jury is invited to consider more generally that the defendant declined to testify.  These constitutional violations were not harmless beyond a reasonable doubt.

Accordingly, we vacate the death sentences and remand for further proceedings.

Judge Livingston dissents in part in a separate opinion.

BEVERLY VAN NESS, New York, New York; BARRY J. FISHER, Saratoga Springs, New York, <u>for Defendant-Appellant</u>.

Benton J. Campbell, United States Attorney, Eastern District of New York, Brooklyn, New York; MORRIS J. FODEMAN, DAVID BITKOWER (Peter A. Norling, Jason A. Jones, Zainab Ahmad, <u>on the brief</u>), Assistant United States Attorneys, Eastern District of New York, Brooklyn, New York; Jeffrey B. Kahan (<u>on the brief</u>), United States Department of Justice Capital Case Unit, Washington, D.C., <u>for Appellee</u>.

DENNIS JACOBS, <u>Chief Judge</u>:

Ronell Wilson murdered two undercover police detectives who were posing as gun buyers. Wilson appeals from a judgment of conviction and a sentence of death entered on March 29, 2007, in the United States District Court for the Eastern District of New York (Garaufis, <u>J.</u>). Wilson appeals on twelve grounds (some with subparts), among them that: the evidence was insufficient to support a finding under the Violent Crimes in Aid of Racketeering ("VICAR") statute, 18 U.S.C. § 1959, that Wilson acted to maintain or increase his position in a racketeering enterprise; and the district court abused its discretion in cutting off recross-

4

examination that had bearing on whether Wilson shot in perceived self-defense because he thought his victims were about to rob him.  We affirm as to those claims and therefore affirm the convictions.

We likewise affirm the district court's rejection of Wilson's arguments that: voir dire was unfairly biased and constitutionally inadequate; testimony in the penalty phase exceeded what is permissible under the Constitution and the Federal Death Penalty Act, and required an additional corrective charge; and a fellow inmate was acting as a government agent in eliciting admissions from Wilson.

However, we vacate the death sentences, and remand, because two arguments made to the jury by the prosecution-- both bearing on the critical issues of remorse, acceptance of responsibility, and future dangerousness--impaired Wilson's constitutional rights.  The government argued: [i] that Wilson put the government to its proof of guilt rather than plead guilty; and [ii] that Wilson's allocution of remorse should be discredited because he failed to testify notwithstanding the fact that "[t]he path for that witness stand has never been blocked for Mr. Wilson."  As to the first argument, although a guilty plea may properly be

5

considered to support a sentence mitigation for acceptance of responsibility, the Sixth Amendment is violated when failure to plead guilty is treated as an aggravating circumstance.  As to the second, it is a fair argument for the prosecution to say that an allocution of remorse is unsworn and uncrossed, but the Fifth Amendment is violated when the defendant is denied a charge that limits the Fifth Amendment waiver to that which is said in the allocution and the jury is invited to consider more generally that the defendant declined to testify.  These constitutional violations were not harmless beyond a reasonable doubt.

Accordingly, we vacate the death sentences and remand for further proceedings.[1]

## BACKGROUND

Wilson was convicted on five capital counts: two counts of murder in aid of racketeering under VICAR (18 U.S.C. § 1959(a)(1)), two counts of causing a death through the use of a firearm (18 U.S.C. § 924(j)), and one count of

---

[1] There is no merit to Wilson's argument that the case need be remanded to a different district court judge. See United States v. Demott, 513 F.3d 55, 59 (2d Cir. 2008) (per curiam).

6

carjacking with death resulting (18 U.S.C. § 2119(3)).  He was also convicted on five non-capital counts.  At a separate penalty phase, the same jury unanimously voted to sentence Wilson to death on all five capital counts.

Eight of the convictions (including all five capital counts) stem from a March 10, 2003 robbery and murder of New York Police Department detectives James Nemorin and Rodney Andrews.  The other two counts (a robbery conspiracy and the use of a firearm) stem from a May 2, 2002 aborted robbery.  Wilson was arrested on March 12, 2003, two days after the murders.

At trial, the defense contended that the triggerman was Jesse Jacobus, a fellow gang member who was with Wilson during the murders and who testified against him at trial; but Wilson does not appeal the jury's finding that he, Wilson (and not Jacobus), fired the shots.

The district court had jurisdiction to hear the case under 18 U.S.C. § 3231.  This Court has jurisdiction over an appeal from a final order of the district court under 28 U.S.C. § 1291.

**A**

7

The Stapleton Crew was a violent gang that operated in Staten Island from approximately 1999 until it was disbanded by the arrest of the principals following the murders committed by Wilson. The gang was involved in robberies and the sale of drugs. The core members of this gang were Michael Whitten, Paris Bullock, Omar Green, Hason Taylor, and Rashun Cann; associated gang members included Mitchell Diaz, Jacobus, and the appellant, Wilson.[2]

The Stapleton Crew collectively owned several guns that were available for the members' use. One week before the murders, on March 3, 2003, Whitten and Green sold one of these guns, a .357 caliber revolver, for $780. The buyer in that transaction was actually Detective Nemorin working undercover. He made no arrest at that time because he wanted to further infiltrate the gun-sale operation and make additional arrests later. Accordingly, he arranged to purchase another of the Stapleton Crew's guns the following week.

---

[2] The government called Diaz and Jacobus as cooperating witnesses in the guilt phase of this case to testify about the criminal activities of the gang and the murders of the police officers. Both these men had pleaded guilty to felony murder in state court and would be sentenced to 15-25 years to life in prison.

**B**

Detective Andrews volunteered to accompany Detective Nemorin as backup at the second transaction. They were accompanied at a distance by officers on foot and in nearby cars; one of the putative gun buyers wore a fake beeper that would broadcast audio to officers conducting surveillance.

In advance of the March 10 meeting, members of the Stapleton Crew decided to rob the buyer of the $1,200 price rather than deliver the gun. The discussion among Wilson, Diaz, Bullock, Whitten, and Green in Green's apartment was as follows: Jacobus would assist Wilson; Wilson would be armed with one of the communal guns, which (Wilson was told) he might have to use; Green or Whitten raised the possibility that Detective Nemorin might be a police officer or a thief attempting to rob the Stapleton Crew; Wilson committed to go through with the robbery anyway if Green and Whitten wanted him to do so; Green and Whitten then approved of the planned robbery.

On the night of March 10, 2003, Wilson and Jacobus got into the back seat of the undercovers' car (Wilson sat behind the driver, Detective Nemorin). Wilson directed the

9

driver to another neighborhood in Staten Island, where Wilson got out, met Diaz, and picked up the .44 caliber pistol ultimately used in the murders. Wilson and Diaz discussed what both recognized to be an undercover police presence in the area, although Diaz stated that he told Wilson he did not believe the police were deployed on their account. Wilson, now armed, rejoined the others in the car, and directed the driver to another neighborhood (where the planned robbery would take place).

When they arrived, Wilson briefly stepped out of the car. When he got back in, Wilson shot Detective Andrews in the head. Wilson then pointed the gun at Detective Nemorin and said, "Where's the shit at? Where's the shit at? Where's the money? Where's the shit at?" Jacobus testified that Detective Nemorin "was pleading for his life" before Wilson shot him in the head.

Wilson and Jacobus left the car with the victims' bodies inside, walked quickly to the nearby apartment of Wilson's stepfather, entered with Wilson's key, and stashed the murder weapon in a closet. Wilson and Jacobus then returned to the car and pulled the bodies out to search them for money. Leaving the bodies in the street, they drove off

10

in the bloodstained car.  As they drove away from the crime scene, Jacobus asked Wilson why he shot the men; Wilson responded, "I don't give a fuck about nobody."

Wilson and Jacobus parked the car near the Stapleton Projects and began to search it for money.  Wilson found a gun under the front passenger seat and said, "[t]hey was going to get us before we got them."  Jacobus testified that Wilson had not previously suggested that the killings were preemptive.  Wilson kept the gun he took from the car.

As Wilson and Jacobus walked back to the projects, Wilson yelled something to a passing police car.  The police car stopped and the officers got out; Wilson and Jacobus ran, and the officers pursued; Jacobus was arrested a short distance away.

Wilson escaped into the Stapleton Projects, and went to Green's apartment, where Green was with Diaz.  Diaz testified that Wilson was asked what happened, and Wilson responded that he, Wilson, had "popped" the buyers.  Diaz recalled that Wilson said other things as well, but in a ruling contested on this appeal, questioning of Diaz on that issue was terminated.  Wilson left the apartment with Green and Diaz.

Wilson was arrested two days later in Brooklyn.  In his pocket the arresting officers found (among other things) rap lyrics he had written that arguably describe the murders.

**C**

In March 2003, Wilson was indicted in state court for first-degree murder, and the district attorney filed notice of intent to seek the death penalty.  In June 2004, the New York Court of Appeals ruled that the state's death penalty statute violated the New York Constitution.

The federal government then took up the prosecution. On November 17, 2004, a federal grand jury indicted Wilson, Bullock, Whitten, and two other members of the Stapleton Crew.  Wilson's four co-defendants each pled guilty to racketeering and narcotics charges, and have been imprisoned for a term of years.

A notice of intent to seek the death penalty was filed in federal court on August 2, 2005.  In September 2006, the grand jury approved a superseding indictment that served as the trial indictment, charging Wilson on five capital counts (two charges of murder in aid of racketeering, two charges of firearm murders during a robbery, and one charge of

carjacking murder) as well as five non-capital counts (three of which stem from the March 10, 2003 robbery and two from a previous aborted robbery).

The government gave notice that it was seeking the death penalty on the basis of six aggravating factors.  The two statutory aggravating factors were [i] that he committed the murders in the expectation of the receipt of something of pecuniary value and [ii] that he intentionally killed more than one person in a single criminal episode.  See 18 U.S.C. § 3592(c)(8), (c)(16).  The non-statutory aggravating factors were [iii] that the victims were law enforcement officers murdered during their official duties, [iv] that Wilson faced contemporaneous convictions for serious acts of violence, [v] that Wilson was a continuing danger to others, and [vi] that the victims' deaths impacted survivors.  See 18 U.S.C. § 3593(a)(2).  On appeal, Wilson argues that the victim impact evidence should have been limited to family, and that in any event he was prejudiced by the emotional content of the victim impact testimony.

Approximately 600 potential jurors were assembled in September 2006 and filled out a questionnaire.  Individual voir dire of approximately 260 potential jurors began in

13

October 2006 and ended on November 16, 2006, during which time the parties submitted and objected to proposed written questions for the court to pose.  After voir dire, the defense moved to discharge all twelve seated jurors; the motion was denied.  On appeal, Wilson argues that the voir dire was biased to favor the prosecution and unconstitutionally omitted a critical inquiry--the willingness of the jury to consider childhood deprivation as a mitigator.

At the guilt phase of trial, the government largely proved the case set out above in connection with the March 10, 2003 double homicide.  Wilson argues on appeal that the trial evidence did not sufficiently prove that he killed for pecuniary gain or for position in the gang, an element of murder in aid of a racketeering activity.  On December 20, 2006, the jury returned guilty verdicts on all ten counts against Wilson.

**D**

At the penalty phase of the trial the government relied on six aggravating factors to justify a sentence of death. The two factors expressly listed in the statute had been the

14

subject of evidence in the guilt phase: killing for pecuniary gain and killing multiple people in a single incident.  See 18 U.S.C. § 3592(c)(8), (c)(16).  Of the four non-statutory factors, two had been the subject of evidence in the guilt phase: killing law enforcement officers in the course of duty and contemporaneous convictions for serious acts of violence (the earlier aborted robbery).  The government's case at sentencing was therefore focused on two (non-statutory) aggravating factors: victim impact and future dangerousness.

The government's victim impact evidence consisted of: five witnesses who testified primarily about Detective Andrews (his widow, sister-in-law, son, cousin, and a friend in the police department); five witnesses who testified primarily about Detective Nemorin (his widow, mother-in-law, sister, former supervisor, and a friend in the police department); 41 photos of the detectives as they were in life; and an excerpt from a documentary film (sponsored by one of the police witnesses) in which Detective Nemorin discussed his job as an undercover police officer.  Wilson objected to much of this evidence on a number of grounds.

To show future dangerousness, the government adduced

15

Wilson's record of increasingly serious offenses, starting at age 11. The offenses included robberies and assaults. The victim of an assault committed when Wilson was 19 years old required 300 stitches. Between ages 15 and 17, Wilson was confined to a maximum security juvenile facility for robbery; at 17, he entered Rikers Island for one year. Wilson murdered Detective Andrews and Detective Nemorin when he was 20 years old. The prosecution also cited a long disciplinary record of prison offenses. Moreover, the prosecution established that Wilson was a member of the Bloods gang, stayed a member while in prison, and had (on at least two occasions) told fellow gang members to "pop off" (i.e., attack the guards).

To testify about the Bloods' structure and organization, and how acts of violence move a member up within the gang hierarchy, the government put on a cooperating witness, Shabucalik Geralds, a former Bloods member who was still to some extent affiliated with the gang at the time he testified. Geralds, who encountered Wilson in prison while Wilson was detained following the murders, also testified to statements made by Wilson. The defense argues on appeal that Geralds's testimony about the Bloods

16

was unreliable opinion testimony lacking a foundation of personal knowledge and that Geralds was a government agent when he elicited information from Wilson.

Wilson put on an expert witness to refute the idea that he would be a danger in prison. Donald Romine, a former Bureau of Prisons supervisor, testified that prisons have many effective controls in place to prevent violence, that Wilson's prison disciplinary record was unremarkable, and that the Bloods gang does not present a particularly high risk within the federal prison population. On cross-examination, the prosecution elicited testimony from Romine about the internal workings of the Bloods, including that acts of violence could lead to promotion within their ranks.

Wilson's affirmative case in the sentencing phase focused on mitigating factors relating to his Dickensian upbringing. His father was largely absent; his mother was a drug addict; and he lived in poverty either with them or with other relatives. State child services intervened on several occasions. Wilson lived for a time with his grandmother in a three-bedroom apartment in the Stapleton Projects, along with twelve other people. When Wilson was six years old, he was hospitalized three times for

17

psychiatric difficulties, including suicidal tendencies. Prior to his hospitalizations, child services had taken him away from his mother, and given him over to his aunt. Wilson exhibited both sadness and aggression at school. His IQ has been tested in the high 70s. The defense also called members of Wilson's family to testify about his loving relationship with them, and how they would suffer if he is executed.

The defense received permission for Wilson to read aloud an allocution of remorse, both to support the mitigating factors of remorse and acceptance of responsibility and to counter the prosecution's aggravating factor of future dangerousness. The defense argues on appeal that the district court improperly limited the scope of Wilson's allocution of remorse and that the court's rulings and the prosecution's improper arguments on summation ultimately caused the jury to hold against him his allocution of remorse, his exercise of the right to trial, and the fact that he did not testify.

The jury unanimously voted to sentence Wilson to death on each of the five capital counts. The special verdict form reports unanimous findings beyond a reasonable doubt

that the prosecution established the two statutory aggravating factors and each of the four non-statutory aggravating factors. Further, the jury unanimously found that 14 mitigation factors were proven by a preponderance of the evidence. No juror found that Wilson was remorseful or that he took responsibility for his actions.

The district court entered judgment on March 29, 2007. Wilson appeals from that judgment.

**DISCUSSION**

Two grounds of appeal would impact Wilson's convictions: whether the evidence was sufficient to support a finding under the VICAR statute that Wilson committed the murders to maintain or increase his position in the gang (see Point I); and whether the district court abused its discretion in curtailing recross-examination that had bearing on whether Wilson shot the detectives out of perceived self-preservation (see Point II). We affirm as to these claims and, therefore, affirm the convictions.

The remaining grounds of appeal challenge the sentence of death. These include whether the judge's voir dire inquiries were improperly biased (see Point III); whether

19

testimony in the penalty phase exceeded what is permissible under the Constitution and the Federal Death Penalty Act, and required a corrective charge (see Point IV); and whether a fellow inmate was acting as a government agent in eliciting admissions from Wilson (see Point V). We reject those challenges.

However, we vacate the death sentences, and remand, on the grounds that two arguments made by the prosecution, both bearing on the critical issue of Wilson's claimed remorse and acceptance of responsibility, violated Wilson's constitutional rights (see Points VI and VII). These constitutional violations were not harmless beyond a reasonable doubt (see Point VIII), and so we vacate and remand.

Wilson further appeals his sentence of death on additional grounds that we can reject without making new law (see Point IX).

**I**

Wilson contends that the evidence was insufficient to support a jury finding that he had acted with any of the motives required for conviction under the VICAR statute, and

that his convictions on Counts One and Two of the indictment must therefore be vacated.

The VICAR statute provides, in pertinent part:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . any individual in violation of the laws of any State or the United States . . . shall be punished-- (1) . . . by death or life imprisonment, or a fine under this title, or both.

18 U.S.C. § 1959(a). The government undertook to show that Wilson acted for pecuniary gain and "for the purpose of . . . maintaining or increasing position" within the Stapleton Crew. Id. Because we conclude that there was sufficient evidence to support the finding that Wilson acted for status and position we need not consider pecuniary gain.

To show that Wilson acted "for the purpose of . . . maintaining or increasing position," the prosecution must show [i] "that [Wilson] had a position in the enterprise," and [ii] "that his general purpose" in murdering Detectives Nemorin and Andrews "was to maintain or increase his position in the enterprise." United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992). "[M]aintaining or

21

increasing position in the [racketeering] enterprise [need not have been] defendant's sole or principal motive." Id. "[T]he motive [element is] satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." Id.; see also United States v. Dhinsa, 243 F.3d 635, 671 (2d Cir. 2001) ("[S]ection 1959 encompasses violent crimes intended to preserve the defendant's position in the enterprise or to enhance his reputation and wealth within that enterprise." (emphasis omitted)).

There is evidence that Wilson murdered the two detectives in order to improve his position within the Stapleton Crew. Jacobus made the connection between violence by Crew members and status within the Crew. He testified that he himself committed crimes "to raise [his] status" within the group, that Wilson enjoyed "a certain status" due to his reputation for violence, and that violent acts, especially the murder of police officers, would enhance one's "status" within the Stapleton Crew. That such conduct would enhance Wilson's status is confirmed by

22

evidence of the Crew's violent character.  The gang's members regularly committed violent acts on behalf of the Crew with fellow members.  Members were expected to adopt each other's grievances, and to react with violence toward offending outsiders, including any member of the rival 456 gang.  The Crew possessed firearms for use by its members.  Photographs show members of the Stapleton Crew brandishing firearms and displaying gang signs.  Rap lyrics written by a member celebrate the Crew's rivalry with the 456.  Finally, as Diaz testified, Wilson went from the murders to the apartment of one of the Crew's leaders, reported to those present that he had "popped" (i.e., shot) his victims, and produced Detective Nemorin's pistol.

In reviewing a conviction for sufficiency of evidentiary support, "the trial evidence is viewed most favorably for the Government" and "all reasonable inferences a jury may have drawn favoring the Government must be credited."  United States v. Wexler, 522 F.3d 194, 206-07 (2d Cir. 2008).  We affirm "'if any rational trier of fact could have found the essential elements of [the] crime beyond a reasonable doubt.'"  Id. at 207 (emphasis omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

23

We conclude without difficulty that there is sufficient evidence of Wilson's "position in the enterprise." Concepcion, 983 F.2d at 381.  It is a closer question whether Wilson's "general purpose" in murdering Detectives Nemorin and Andrews was "to maintain or increase his position in the enterprise," id., but we find sufficiency.

First, Jacobus testified that violent acts by members of the Stapleton Crew enhance status within the group.[3] This testimony was reinforced by evidence that the Crew encouraged and even glorified violence:  Members regularly

---

[3] Wilson contends that Jacobus lacked first-hand knowledge of facts sufficient to provide a rational basis for his testimony on the status effects of violent acts by members of the Stapleton Crew, and that this testimony was therefore admitted in violation of Federal Rule of Evidence 701.  See United States v. Rea, 958 F.2d 1206, 1215 (2d Cir. 1992) ("The rational-basis requirement [of F.R.E. 701] 'is the familiar requirement of first-hand knowledge or observation.'" (quoting Fed. R. Evid. 701 Advisory Comm. Note on 1972 Proposed Rules)).  We disagree.  Jacobus testified generally to what an act of violence would do for a member's status, not directly to what Wilson knew or believed.  Cf. United States v. Kaplan, 490 F.3d 110, 117-19 (2d Cir. 2007); United States v. Garcia, 291 F.3d 127, 140-41 (2d Cir. 2002).  There is ample evidence of Jacobus's many connections to the Stapleton Crew and relationships with its members.  This foundational evidence supported a conclusion that Jacobus had sufficient knowledge about the Crew's culture, hierarchy, and organization to testify to the status effects of violence.  Admission of his testimony was not an abuse of discretion.  Cf. Kaplan, 490 F.3d at 117-19.

24

organized and committed violent crimes and retaliatory acts of violence; the Crew made available firearms for such purposes; photographs and rap lyrics reflect group pride in its violent character.

Second, there is evidence that the murders were contemplated and implicitly authorized by the group's leaders. Green directed Wilson to commit the robbery, and it was decided that Wilson would carry the firearm, which was provided by the Crew. At the planning meeting in Green's apartment, which included the group's leaders, it was acknowledged that Wilson "might have to use" the gun with which they were going to commit the robbery--i.e., that Wilson might have to "shoot" one or more of the victims, and that one or another of the victims "might be a cop or he may be trying to rob" Wilson or Jacobus. When Wilson was then "asked whether he wanted to go ahead with" the robbery, he deferred to Green and Whitten--two of the group's leaders-- and it was decided that the robbery would proceed notwithstanding the risks.

Third, Wilson's actions after the murders suggest that he was proud of the crimes and wanted others to be made aware of them. When asked immediately after the murders why

25

he had killed the officers, Wilson responded with bravado, "I don't give a fuck about nobody"; and when Wilson was returning to his apartment after the murders, he called out to a police car, "[W]hat, are you looking for more trouble?"[4]  Furthermore, Wilson reported back to one of the Crew's leaders--Green--following the murders.  Finally, given the modest expected yield from the robbery (the gun transaction totaled $1,200[5]), the jury may rationally have concluded that Wilson had an additional, non-pecuniary motive for committing such a crime.

Wilson argues that, in any event, maintenance or increment in gang "status" is not a purpose that falls within the category of qualifying statutory motives.  The argument is premised on a distinction between "status," which Jacobus testified would be increased by violence, and "position," the word used in the VICAR statute.  That distinction is not so clear as Wilson makes it out to be; in

---

[4] Though testimony differed as to what was said, the jury was free to credit this version, which was reported by one of the police officers present, and we are bound to respect that conclusion.  See Wexler, 522 F.3d at 206-07.

[5] Some testimony suggests that the amount was $1,300, but the jury was free to credit testimony as to the lower amount, and we are bound to construe all evidence in favor of the Government.  See Wexler, 522 F.3d at 206-07.

26

ordinary usage the words are synonyms, and in the dictionary they reference each other. One definition of "status" is "position or rank in relation to others." Webster's Third New International Dictionary Unabridged 2230 (Philip B. Gove ed., Merriam-Webster 3d ed. 1986) (1961). And "position" in turn, means "social or official rank or status." Id. at 1769. "Position" should not be construed so narrowly as to distinguish it from "status." It does not matter, for example, that the Stapleton Crew did not promote by grade in a ramified hierarchy.

Wilson contends that, on this record, status was at most a secondary or incidental motive for his crimes, and that the evidence therefore does not sustain a conviction under the VICAR statute. See, e.g., United States v. Thai, 29 F.3d 785, 817-19 (2d Cir. 1994) (insufficient evidence to sustain VICAR conviction because the only evidence of motive suggested defendant had acted for pecuniary gain); United States v. Jones, 291 F. Supp. 2d 78, 87-89 (D. Conn. 2003) (insufficient evidence to sustain conviction where there was little evidence that act was motivated by anything other than personal animus). Wilson argues that in fact the primary motive was self-defense. However, the only evidence

27

bearing upon a self-defense theory is testimony by Jacobus that, when he and Wilson returned to the detectives' car following the murders, Wilson found a gun under the driver's seat, and said "[t]hey was going to get us before we got them." This statement says nothing about Wilson's belief or motivation at any point prior to the moment he found the gun, after the deed was already done. In any event, the evidence discussed supports a jury finding that incremental status was one of Wilson's primary motives; that is enough. See United States v. Farmer, 583 F.3d 131, 143-44 (2d Cir. 2009) ("The government was not required to prove that [defendant's] sole or principal motive was maintaining or increasing his position, so long as it proved that enhancement of status was among his purposes." (internal quotation marks and citation omitted)).

Finally, Wilson argues that there is no evidence the murders increased Wilson's status in fact. This argument is foreclosed by Farmer, 583 F.3d at 142 ("[T]he question is not whether [defendant's] position . . . was advanced in fact by the murder he committed, but whether his purpose in committing the murder was to benefit his position.").

Accordingly, we hold that sufficient evidence supported

28

Wilson's convictions for murder in aid of racketeering in violation of 18 U.S.C. § 1959, Counts One and Two of the indictment.

**II**

Soon after the murders, Wilson returned to the Stapleton apartment of Green. According to the testimony of Diaz--who was in the apartment with Green--Wilson announced that he had "popped" the two victims. Green did not testify; but he was the subject of a Brady letter, according to which Green "informed the government that Wilson actually said that he killed the victims because 'they were going to rob us.'" See generally Brady v. Maryland, 373 U.S. 83, 87-88 (1963). Green's § 3500 material indicated that Wilson also said the victims were pulling out their weapons. See United States v. Rigas, 583 F.3d 108, 125 (2d Cir. 2009) (noting that 18 U.S.C. § 3500 "codif[ies] the government's disclosure obligations during criminal proceedings").

For the first time, on recross-examination, the defense asked Diaz if he had heard Wilson make the statements attributed to him in the Brady letter and other related statements. The court sustained the prosecution's repeated

29

objections that the questions were outside the scope of redirect.  The relevant passage in the government's direct-examination of Diaz is as follows:

**PROSECUTION:** What did [Wilson] say?

**DIAZ:** I don't remember his exact words, but he said something to the [e]ffect that he popped him.

**PROSECUTION:** The word "pop" you used, is that a word that the defendant used?

**DIAZ:** Yes.

Wilson concedes that "[d]efense counsel did not cross-examine Diaz about what Wilson said on his return to Green's apartment."  On this topic, cross-examination touched only on whether Diaz had a clear memory of Wilson's declaration that he had "popped" the victims.  On redirect, the government therefore rehabilitated Diaz's memory of Wilson's admission:

**PROSECUTION:** When the defendant said "I popped them," what did you understand him to mean?

**DIAZ:** That he shot them.

**PROSECUTION:** Shot who?

**DIAZ:** The victims.

**PROSECUTION:** Human beings?  People?

**DIAZ:** Yes.

30

The government concluded Diaz's redirect with the following line of questioning:

PROSECUTION: Do you have any doubt, any doubt at all, that when you got back to Omar Green's house, that [Wilson] came into the house and said I popped them? Do you have any doubt about that?

DEFENSE: Objection to the leading form of the question, Your Honor.

COURT: You may answer.

PROSECUTION: Do you have any doubt about that, sir?

DIAZ: No.

On recross, defense counsel turned to Wilson's admission that he had "popped" the victims:

DEFENSE: [Wilson] said more than popped him, isn't that correct?

DIAZ: Yes.

DEFENSE: He said something like they pulled out, did you hear that?

PROSECUTION: Outside the scope, Your Honor. Objection.

COURT: Sustained.

DEFENSE: He said something like, they were trying to rob us?

PROSECUTION: Objection.

COURT: Sustained.

DEFENSE:          Do you remember hearing anything like that?

PROSECUTION:      Objection, Judge.  Outside the scope.

COURT:            Sustained.

DEFENSE:          There were more words than popped him, isn't that correct, sir?

PROSECUTION:      Objection.  The same objection.

COURT:            You may answer.

DIAZ:             Yes.

DEFENSE:          You don't remember those other words, isn't that correct, sir?

PROSECUTION:      Objection.  That's not what he said.

COURT:            Sustained.

DEFENSE:          While all this was going on, you were a nervous wreck, isn't that correct, sir?

DIAZ:             Yes.

DEFENSE:          Thank you.

Wilson contends that this curtailment of Diaz's recross was error, that Diaz's answers might have indicated that Wilson acted out of a perceived need for self-preservation, and that reasonable doubt thereby would have been raised regarding Wilson's "pecuniary" and "position" motives for the murders.

32

"Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Fed. R. Evid. 611(b). "The scope and extent of cross-examination are generally within the sound discretion of the trial court, and the decision to restrict cross-examination will not be reversed absent an abuse of discretion." United States v. Rosa, 11 F.3d 315, 335 (2d Cir. 1993). In the exercise of discretion, a district court should consider the need to "ascertain[ the] truth," "avoid needless consumption of time," and "protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a); see also Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (explaining that the district court has "wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, . . . interrogation that is repetitive or only marginally relevant"). A good faith basis for proposed questions is relevant to these considerations. On the facts of this case, we detect no abuse of discretion in the district court's control of Diaz's recross-examination.

33

The precluded questions were outside the scope of Diaz's redirect-examination. As the transcript excerpts show, the defense effort on recross was to place Wilson's admission in the context of other and additional statements, whereas the government had returned to the subject on redirect for the sole purpose of countering the defense's attack on the clarity of Diaz's memory concerning that one admission. Even though the precluded questions were outside the scope of redirect, the district court retained discretion to permit them. But Wilson failed to adduce his good faith basis for the precluded questions or explain the significance of Diaz's potential answers, and did not request a sidebar conference to argue any basis upon which the district court should have permitted this line of questioning. See Jones v. Berry, 880 F.2d 670, 673 (2d Cir. 1989) ("[A] party whose prospective questioning is threatened with curtailment should make all reasonable efforts to alert the court to the relevance and importance of the proposed questions.").

No doubt, there was a good faith basis for Wilson's precluded questions; but the trial court was not made aware of it. The Brady disclosure (which, along with Green's §

34

3500 material, furnished the good faith basis) was copied to and discussed with the district court on August 21, 2006. However, more than three months intervened before Diaz's December 4, 2006 recross-examination. Green himself did not testify, and the district court had no occasion to review the Brady disclosure (or Green's § 3500 material) in preparation for testimony by Diaz. There is no reason to believe that the good faith basis for the precluded questions would have been fresh in the district court's mind, and there is no indication of any defense effort to refresh.

Moreover, there is no reason to believe that the district court would have understood the significance of Diaz's potential answers. Defense counsel could have asked the precluded questions on Diaz's cross-examination, and the judge could assume that the questions would have been asked then if they were of great import. Furthermore, the precluded questions represented a wholly new departure. Throughout the guilt phase, Wilson's theory of the case was that Jacobus pulled the trigger, not Wilson, whereas the precluded questions were based on the idea that Wilson pulled the trigger, albeit out of a perceived need for self-

35

preservation.

Accordingly, we detect no abuse of discretion in the district court's control of Diaz's recross-examination, and we therefore find no error.

As we find no error in the guilt phase, we affirm Wilson's convictions.

**III**

The district court declined to include in its written jury questionnaire the following question, proposed by Wilson:

> If Ronell Wilson is found guilty of murder for the intentional killings of Detectives Nemorin and Andrews, without any legal excuse or justification, the defense might present evidence at a sentencing phase of the trial about Ronell Wilson's childhood and background in support of a sentence other than the death penalty. How relevant is information like that to you when making a decision about punishment for murder?

Wilson requested similar questions during oral voir dire, but the district court declined to pursue the subject uniformly, or at the level of particularity Wilson sought. (A counterpart to this issue is Wilson's Eighth Amendment

argument--rejected in the margin[6]--that the prosecution's penalty phase summations improperly urged the jury to give

[6] The Eighth Amendment forbids a capital sentencing regime in which the jury is "precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Abdul-Kabir v. Quarterman, 550 U.S. 233, 247-48 (2007) (internal quotation marks omitted). According to Wilson, the prosecution's summations advised the jury that only defenses to the crime and the aggravating factors could be considered mitigating evidence, that a death sentence should be imposed irrespective of the mitigation because a sentence of life without parole was appropriate for certain less serious crimes, and that Wilson's merciless conduct rendered him categorically ineligible for mercy. On review, we ask whether there is a "reasonable likelihood that the jurors believed themselves to be precluded from considering [the] mitigating evidence." United States v. Fell, 531 F.3d 197, 223 (2d Cir. 2008) (citing Ayers v. Belmontes, 549 U.S. 7, 24 (2006)).

We see no such likelihood. First, the government's summations deprecated the weight of the mitigating evidence, explained why a life sentence is insufficient, and argued that the victim impact evidence militated against mercy; but the government's summations did not urge the jury to ignore mitigation and repeatedly instructed the jury to consider every mitigating factor. Second, the final jury charge in the penalty phase instructed the jurors to consider the mitigating evidence broadly. Third, the jury heard several days of testimony concerning mitigation, and the prosecution extensively argued the weight of that evidence: "It is improbable the jurors believed that the parties were engaging in an exercise in futility" all that time. Ayers, 549 U.S. at 16-17; see also Brown v. Payton, 544 U.S. 133, 144 (2005); Boyde v. California, 494 U.S. 370, 383-84 (1990); Fell, 531 F.3d at 222-23. Fourth, the verdict form evidences the jury's active consideration of the mitigating evidence.

little or no weight to Wilson's mitigation evidence.)

Wilson assigns constitutional error to these refusals, argues in addition that the propounding of specific questions requested by the prosecution conferred unfair advantage in identifying prospective jurors, and requests that we vacate his death sentence and remand for re-sentencing.[7]

When a district court chooses to examine veniremen itself, it "may ask" questions submitted by counsel "if [the court] considers [the questions] proper." Fed. R. Crim. P. 24(a)(2)(B). Refusal is reviewed for abuse of discretion. United States v. Lawes, 292 F.3d 123, 128 (2d Cir. 2002). That discretion, however, is subject to constitutional limits. United States v. Kyles, 40 F.3d 519, 524 (2d Cir. 1994). The trial court must ask a proposed voir dire question if refusal would "render the defendant's trial fundamentally unfair." Mu'Min v. Virginia, 500 U.S. 415, 425-26 (1991); see also Morgan v. Illinois, 504 U.S. 719,

_____

[7] Even though the same jury sat throughout, the constitutional error Wilson alleges had bearing only on the sentencing phase, so the proper remedy would be vacatur of the death sentence. Morgan v. Illinois, 504 U.S. 719, 739 (1992).

38

730 & n.5 (1992).[8]  Fundamental unfairness arises if voir dire is not "adequate . . . to identify unqualified jurors." Morgan, 504 U.S. at 729.  In capital cases, a juror is constitutionally unqualified if he has "views on capital punishment" that would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  Id. at 728 (internal quotation marks omitted).  That category includes "those prospective jurors who would *always* impose death following conviction." Id. at 733-34.  Thus, in Morgan, sole reliance on general inquiries--as to willingness to "follow [the court's] instructions on the law even though you may not agree" and ability to "be fair and impartial"--did not afford defense counsel an opportunity to identify and challenge for cause those jurors who would automatically impose the death penalty.[9]  Id. at 723-25 (internal quotation marks omitted).

---

[8] Though these cases interpret the Fourteenth Amendment, the Supreme Court has indicated that the relevant protections in state and federal court are coextensive.  See Morgan, 504 U.S. at 726-27; see also United States v. Tipton, 90 F.3d 861, 878-79 (4th Cir. 1996) (applying Morgan to a federal capital trial); United States v. McCullah, 76 F.3d 1087, 1113-14 (10th Cir. 1996) (same).

[9] Defendant-appellant in Morgan had requested in the trial court the following voir dire question:  "If you found [defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?"  504 U.S.

Voir dire in this case proceeded in two stages. First, veniremen completed a 54-page questionnaire that included, *inter alia*, questions about background, relevant media exposure, opinions and biases, and ability to follow the law and discharge a juror's duty. One question (proposed by the government) asked whether "the fact that the victims were killed while working undercover and posing as individuals engaging in illegal conduct [would] affect your ability to fairly and impartially evaluate the evidence in this case." Another asked whether

> you hold any beliefs or opinions that would affect your ability to evaluate . . . testimony [given pursuant to a cooperation agreement with the government] from . . . witnesses [who have lengthy histories of narcotics trafficking and violent criminal conduct and have pled guilty to some of the most serious crimes in the indictment].

With respect to capital punishment, the questionnaire advised:

> Should a "penalty phase" be necessary, the question for the jury to decide is whether the defendant should be sentenced to death or to life imprisonment without the possibility of release. The jury makes this decision by weighing a variety of factors.

The court proceeded to ask the following questions:

---

at 723 (internal quotation marks omitted).

> Do you have any personal beliefs about what the law is or should be regarding the death penalty that would affect your ability to follow the Court's legal instructions?
>
> Would knowing that the defendant faced the death penalty as a possible punishment make you reluctant to impose a sentence of life without the possibility of release even if you thought the circumstances of the case warranted a non-death sentence?

Second, the district court orally examined prospective jurors in person. At the outset of oral voir dire, the district court read a statement to the venire:

> The indictment charges, among other things, that in March of 2003, the defendant murdered two undercover police officers, Detectives James Nemorin and Rodney Andrews, who were attempting to purchase firearms from Wilson and other members of the Stapleton Crew.

The court emphasized, as it had in the jury questionnaire:

> Should a penalty phase be necessary, the question for the jury to decide is whether the defendant should be sentenced to death or to life imprisonment without the possibility of release. The jury makes this decision by weighing a variety of factors.

Thereafter, the district court started questioning the individual veniremen, outside the presence of the other prospective jurors. Counsel was not permitted to ask questions, though both proffered inquiries for the court to make.

41

With two exceptions, each member of the petit jury whose voir dire Wilson challenges[10] was asked some variation of the following question concerning evidence of character and background:  "[W]ould you be willing to consider evidence about the convicted individual's character and background of this case and listen to argument from the defense that the death penalty should not be imposed in this case?"  And each challenged member of the petit jury (with one exception) was asked some variation of the following life-qualifying question: "Would you be able to meaningfully consider life in prison instead of the death penalty as the correct punishment for someone who commits a murder?"[11]

What was done was constitutionally sufficient, and the district court's refusal of Wilson's proffered questions was not error.  Each juror was informed that (in the event of conviction) the jury would determine the sentence based on various factors, and most of them were informed that those factors would include Wilson's character and background. And each juror confirmed, by questionnaire and in person,

---

[10] Wilson concedes that the voir dire of three jurors was sufficient.

[11] Juror 156 answered this question in substance in response to a different inquiry.

that he could meaningfully consider life in prison as a possible sentence. Morgan requires nothing more. See 504 U.S. at 729-39; see also United States v. Tipton, 90 F.3d 861, 878-79 (4th Cir. 1996) (finding Morgan satisfied where district court asked questions sufficient to determine whether any venireman would automatically vote for death). "The district court was not required . . . to allow inquiry into each juror's views as to specific mitigating factors as long as the voir dire was adequate to detect those in the venire who would *automatically* vote for the death penalty." United States v. McCullah, 76 F.3d 1087, 1114 (10th Cir. 1996); see also id. at 1113-14.

Wilson argues that there is a great disparity between the case-specific questioning allowed the prosecution and what Wilson was allowed. However, Morgan demands adequacy, not parity. It requires only that defendants be afforded an opportunity to identify constitutionally biased jurors.

In any event, the record does not reflect the disparity Wilson alleges. He cites four alleged points of error: [i] the district court asked whether juror impartiality would be affected by the fact that the victims were undercover police officers posing as individuals engaged in illegal conduct;

43

[ii] the court asked whether jurors held any beliefs or opinions affecting their ability to evaluate testimony from cooperating witnesses; [iii] the court informed the venire that the murders were multiple; and [iv] the court informed the venire that the victims were police officers.

Wilson argues that the two questions afforded the prosecution more case-specific information than the defense was allowed, and that the reference to two victims, both police detectives, highlighted two of the expected aggravating factors, making each subsequent death-penalty question more particularized and thus more helpful to the government. Viewed in the context of a lengthy questionnaire and extensive oral examination, the two cited questions are hardly sufficient to render the voir dire meaningfully imbalanced, especially since the answers would have been helpful to the defense as well as the prosecution. As to disclosing that there were two victims, both of them police officers, those facts were also built into questions that the defense affirmatively sought, and cannot be deemed prejudicial.

The district court did not abuse its discretion in rejecting Wilson's proposed written and oral voir dire

44

questions.

<h2 style="text-align:center">IV</h2>

During the penalty phase, one of the four aggravating factors that the prosecution undertook to prove was victim impact. The jury unanimously found that the government proved beyond a reasonable doubt that "[d]efendant Ronell Wilson caused loss, injury, and harm to the victims and the victims' families."

To prove this aggravating factor, the prosecution called ten witnesses: seven family members of the murdered detectives (including in-laws); and three police officers who testified that the murders caused them anguish and had a profound influence on other officers who worked with Detectives Andrews and Nemorin, and who admired them personally and professionally.

Wilson challenges the victim impact evidence on three grounds: [i] the testimony of non-family members (i.e., the three police officers) was outside the constitutional and statutory scope of admissible victim impact evidence in a

capital case;[12] [ii] the testimony in the aggregate was prejudicially emotional and the court failed to give proper jury instructions to counteract this; and [iii] the jury improperly inferred and took into account the witnesses' views on sentencing.  We hold that all of the testimony was correctly admitted and that the jury instructions were proper.

**A**

The Constitution.  The Eighth Amendment does not erect a per se bar to the admission of victim impact evidence in a death penalty case.  Payne v. Tennessee, 501 U.S. 808, 827 (1991).  Evidence concerning the personal characteristics of a victim and the effect of a murder on survivors "[i]s simply another form or method of informing the sentencing authority about the specific harm caused" by the defendant's crime in a capital case.  Id. at 825 (evidence of harm is "evidence of a general type long considered by sentencing authorities").

---

[12] Wilson's objections on this point are preserved. After losing his in limine motion that sought to prohibit all non-family testimony, Wilson's attempts to limit that testimony in specific ways did not amount to concession or waiver.

46

At issue in Payne was testimony from a family member of the victims; but while the holding of Payne is therefore expressed in those terms, id. at 827, nothing in the Court's reasoning suggests that the principle is so limited. Elsewhere in the opinion, the Court states that a fact-finder should be allowed to measure the "specific harm" the defendant caused by committing the murder, id. at 825, a phrase broad enough to embrace the loss felt by friends or co-workers who were close to the victim. The opinion refers repeatedly to the specific harm caused as encompassing loss felt by "community" or "society." Id. at 822-23, 825; see also id. at 830 (O'Connor, J., concurring).

We therefore hold that the Constitution allows evidence from non-family members about their own grief and about the loss felt by other non-family members. Other circuits are in accord. See, e.g., United States v. Bolden, 545 F.3d 609, 626 (8th Cir. 2008); United States v. Fields, 516 F.3d 923, 946 (10th Cir. 2008); United States v. Barrett, 496 F.3d 1079, 1098-99 (10th Cir. 2007); United States v. Nelson, 347 F.3d 701, 712-14 (8th Cir. 2003); United States v. Bernard, 299 F.3d 467, 478 (5th Cir. 2002).

The FDPA. Wilson also argues that the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 et seq., limits victim impact evidence to impact on family members. The FDPA governs whether and under what circumstances a sentence of death may be imposed on a defendant, and includes the requirement that the government prove one or more specified aggravating factors beyond a reasonable doubt in order to establish that a defendant is eligible for the death penalty. 18 U.S.C. § 3592(c). The government may also present additional, non-statutory aggravating factors in order to convince the jury that the defendant deserves a death sentence, so long as the government gives notice of which non-statutory factors are to be presented. Id.

As the FDPA was enacted after Payne, Congress specifically indicated that victim impact evidence could be included as a non-statutory aggravating factor:

> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.

18 U.S.C. § 3593(a). Wilson argues that this provision

48

should be read to limit victim impact evidence to impact on the family alone. We read this passage as language of inclusion, not exclusion. It speaks to what "may [be] include[d]." Id.; see also 18 U.S.C. § 3592(c) ("The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists."). The final phrase ("and any other relevant information"), though ambiguous, is read most naturally as a catch-all for what may be deemed "relevant" by the court. Wilson's reading assumes that unless the victim has family, no one suffered loss other than the victim--so that a distant cousin may testify, but not a fiancé or a partner or a friend or a colleague.

Other circuits allow testimony from friends (including friends who are co-workers) regarding the impact of a victim's death, rejecting challenges similar to Wilson's. Barrett, 496 F.3d at 1098 (allowing testimony from police colleagues of victim, and rejecting argument that Congress limited victim impact evidence in federal death penalty cases to evidence "concerning the effect of the offense on the victim and the victim's family" (internal quotation marks and citation omitted)); see also Fields, 516 F.3d at

49

946 (allowing victim impact testimony from non-family members); Nelson, 347 F.3d at 712-13 (same); Bernard, 299 F.3d at 478 (same).

     Utilitarian Loss and Societal Harm.  Wilson argues in the alternative that, even if non-family impacts are not excluded categorically, the Constitution and FDPA prohibit evidence of utilitarian losses to a workplace or evidence of the victims' professional accomplishments.  The police officers here testified for the most part that: [i] the victims had close relationships with their families; [ii] the victims continue to be mourned by members of the New York Police Department who worked with them, including the witnesses themselves; and [iii] the victims were exemplary, heroic policemen.  Wilson argues only the first type of this testimony is admissible.  We disagree.

     Wilson relies on the Tenth Circuit's decision in Fields, which distinguished between co-workers who were also friends with the victim (who could testify) and "co-workers per se" (who could not).  516 F.3d at 946-47.  The court disapproved of co-worker testimony focused on "impersonal utilitarian considerations" such as "the loss of [the

victim's] contribution to an office, unit, or team; the kind of loss that businesses insure with 'key man' policies." Id. (holding nonetheless that the testimony at issue in the case came from a co-worker who was a friend and therefore was acceptable). Whether or not we are persuaded by Fields, the victims' colleagues in this case testified to personal loss, even though it concerned in part loss experienced in a workplace that fosters intense loyalty and camaraderie. They did not adduce the "impersonal utilitarian considerations" that concerned the court in Fields and therefore the colleagues' testimony was properly admitted.

Wilson characterizes as utilitarian in character the testimony describing Detectives Andrews and Nemorin as heroic individuals who loved their work and inspired other policemen. Such testimony is permissible to show a "victim's uniqueness as an individual human being." See Payne, 501 U.S. at 823 (internal quotation marks omitted). As the Payne concurrence explains, the prosecution may, consistent with the Constitution, show "all that is special and unique about" the victim, including their "hopes, dreams, and fears." Id. at 832 (O'Connor, J., concurring).

To demonstrate that victims in capital cases were

51

special and unique human beings, courts have allowed testimony concerning a victim's professional life. See, e.g., Barrett, 496 F.3d at 1099 (allowing testimony about "the personal and professional characteristics of [the victim]"); Bernard, 299 F.3d at 479 (allowing testimony that the victims were religious youth ministers in part "[b]ecause religion played a vital role in [their] lives, [and so] it would be impossible to describe their uniqueness as individual human beings without reference to their faith" (internal quotation marks omitted)); United States v. McVeigh, 153 F.3d 1166, 1219 (10th Cir. 1998) ("Numerous witnesses . . . testified about the professional and personal histories of victims who perished in the bombing, including reflections on the admirable qualities of the deceased.").

The police officers' testimony that dealt with the victims' outstanding careers, including the excerpted documentary videotape that showed Detective Nemorin discussing his job, was therefore properly admitted.

Finally, Wilson contends that the testimony by the police officers went beyond evidence of the "specific harm" caused by the defendant, as allowed in Payne, and invoked a

generalized community harm. See Fields, 516 F.3d at 947 (noting its concern with "replacing a close-in focus on persons closely or immediately connected to the victim with a wide view encompassing generalized notions of social value and loss"). However, no prohibition on such evidence is generally recognized. See, e.g., United States v. Battle, 173 F.3d 1343, 1348 (11th Cir. 1999) (allowing testimony about how much more difficult a prison was to administer after the murder of a guard); Bernard, 299 F.3d at 479 (allowing testimony related to the victim's proselytizing due to its relevance to a "'community's loss at [the victims'] demise'" (quoting South Carolina v. Gathers, 490 U.S. 805, 821 (1989) (O'Connor, J., dissenting), overruled by Payne, 501 U.S. 808)).

In any event, once the testimony of the detectives' heroism and professional accomplishments is properly characterized as evidence of their uniqueness as human beings, and therefore admissible, Wilson's argument on generalized societal harm comes down to a single sentence: One police colleague testified that the murder of Detective Andrews "robbed the City of New York of another layer of security, and, more importantly, took away a father from his

53

children." In that sentence, harm to the City is expressly subordinated to the harm suffered by the victim's children. Moreover, the reference to societal harm does not appear to go beyond the scope of what is deemed permissible; Payne references harm to society or community, but teaches that the Constitution allows only evidence that describes the "specific harm" caused by the crime. See Payne, 501 U.S. at 822, 823, 825; see also id. at 830 (O'Connor, J., concurring).

The victim impact testimony given by the victims' police colleagues was admitted without error.


**B**

Due process is violated when victim impact evidence is introduced that "is so unduly prejudicial that it renders the trial fundamentally unfair." Payne, 501 U.S. at 825. Similarly, the FDPA requires remand if "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. § 3595(c)(2)(A). Wilson argues that his sentence was an arbitrary outcome resulting from unduly prejudicial victim impact testimony.

Wilson concedes that he lodged no contemporaneous

objection to the testimony.  We thus review for plain error.  See Puckett v. United States, 129 S. Ct. 1423, 1429 (2009).  We conclude there was no error in the admission of the testimony, or in the district court's refusal to grant a mistrial.

The family members of Detectives Andrews and Nemorin delivered emotionally charged testimony.  The anguished testimony of Detective Nemorin's widow described how her children visit the cemetery on Father's Day and other occasions, write letters to their father, and embrace his headstone.  Even such testimony does not appear to exceed (or approach) the margins of what has been allowed.[13]  It

---

[13] The victim impact testimony deemed admissible in Payne was delivered by a witness who was mother to one victim and grandmother to a second.  She testified that her grandson, a small child at the time of trial, "cries for his mom.  He doesn't seem to understand why she doesn't come home.  And he cries for his sister Lacie.  He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie.  And I tell him yes.  He says, I'm worried about my Lacie."  Payne, 501 U.S. at 814-15 (internal quotation marks omitted); see Nelson, 347 F.3d at 713 (no undue prejudice where "[a] fair summation of [the witnesses'] collective testimony is that the witnesses provided emotional and, on occasion, tearful testimony about [the victim] and the impact of her murder on their lives"; this included testimony from the victim's sister who began testifying but broke down and was unable to continue); United States v. Chanthadara, 230 F.3d 1237, 1274 (10th Cir. 2000) (allowing young children to testify in tears about their murdered mother); McVeigh, 153 F.3d at 1219-22

55

cannot be expected that victim impact testimony will be cool and dispassionate. Some deaths cause more suffering than others. The only way to ensure against victim impacts caused by one's murder of a well-loved human being is to take care to murder no one at all.

Courts are reluctant to conclude that the jury was unduly prejudiced by emotional testimony if the defendant presented mitigating factors that the jury found proven and if the trial court instructed the jury about not giving a verdict based on emotion. See McVeigh, 153 F.3d at 1222; see also Nelson, 347 F.3d at 713 (discussing how the presentation of mitigators reduces risk of jury prejudice from victim impact evidence). We presume that juries follow instructions; and a jury diligent and dispassionate enough to find mitigating factors is unlikely to have been overmastered by emotion. See Richardson v. Marsh, 481 U.S. 200, 206 (1987) (juries are presumed to follow instructions). Wilson's jury found 14 mitigating factors, one of them (peer pressure) a factor not even argued by the defense. We therefore go on to consider the instructions to

---

(allowing intensely emotional testimony from numerous witnesses).

56

the jury.

Consistent with the statutory prohibition, the jury was charged not to rule on the basis of passion, prejudice, or arbitrary factors. See 18 U.S.C. § 3595(c)(2). Before the final five victim impact witnesses testified, Wilson requested that the court instruct the jury not to be overpowered by emotion. The judge complied and told the jury that:

> You are about to hear more testimony about the impact of the murders on the victims' family members and colleagues. The law permits you to hear this evidence. However, by its nature, it is highly emotional. I instruct you not to let this evidence overwhelm your ability to follow the law as I will instruct you before deliberations. You must decide the proper punishment without undue passion or prejudice.

Before final deliberations, the court charged:

> In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you. Passion, prejudice, and arbitrary considerations have no role to play in your efforts to reach a just result in this case.

See 18 U.S.C. § 3595(c)(2). These instructions were sound.[14]

---

[14] Wilson challenges the sufficiency of these jury instructions on the ground that the first instruction should have been repeated immediately before deliberations. Since

57

We conclude that the testimony was not overly prejudicial and was admitted without error.

                              C

"[T]he admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment."  Payne, 501 U.S. at 830 n.2.  Wilson argues that the jurors were improperly influenced because they could infer that the victim impact witnesses wanted execution.  However, no evidence as to the witnesses' preferred sentence was actually admitted.  Because there was no evidence to exclude, this claim necessarily fails.[15]

_____

the charge given at the end effectively expressed what the defendant wanted conveyed, the district court did not err in refusing the repetition.  See generally United States v. Desinor, 525 F.3d 193, 201 (2d Cir. 2008); cf. McVeigh, 153 F.3d at 1222 & n.50 (allowing much more victim impact testimony while only giving a single instruction, similar to the second of the two instructions given here).

[15] Wilson's subsidiary argument--that the court erred by refusing an instruction that the jury ignore the victim impact witnesses' opinion as to sentencing--fails for the same reason; as the witnesses presented no such views, there was nothing for the jury to disregard.  In any event, the court captured the essence of this instruction when it charged the jury that the question whether to sentence the defendant to death or not "is a decision that the law leaves entirely to you."

The victim impact evidence presented in this case was properly admitted, was not overly prejudicial, and was considered in the light of jury instructions that were properly framed.

**V**

Shabucalik Geralds, a gang associate of Wilson and a former member of the Bloods, testified for the prosecution about the Bloods (one of Wilson's affiliations) and about an admission made by Wilson when both men were confined in the same prison unit. Wilson argues that Geralds was a government agent at the time Wilson confided to him that his, Wilson's, efforts on behalf of the Bloods entitled him to senior status in the gang, and hence that the testimony was inadmissible under the Supreme Court's decision in Massiah v. United States, 377 U.S. 201 (1964). (Wilson's contention that Geralds and another witness gave testimony about the Bloods that was inadmissible is rejected in the margin.[16])

---

[16] Wilson also challenges Geralds's competence to testify about the Bloods. Geralds had been a member of the Bloods for a short time, long in the past; however, much of his testimony was explicitly based on personal observation, and the rest could be readily inferred to have been learned

59

Wilson had met Geralds through fellow Bloods members Green and Whitten. When Wilson encountered Geralds during Wilson's pre-trial detention, Geralds was subject to a cooperation agreement in another case. In their first conversation in prison, Geralds testified, Geralds mentioned that a high-ranking Blood known as the "Original Gangster Staten Island" (or "OG SI") was in the same prison. Wilson expressed the view that this OG SI was a government informant, and added with a smile that Wilson himself should

through personal observation during his long auxiliary affiliation with the Bloods after his membership lapsed. See United States v. Tocco, 135 F.3d 116, 128 (2d Cir. 1998) (evidence should not be excluded due to a witness's lack of personal knowledge unless a court finds that no "reasonable trier of fact could believe the witness had personal knowledge" (internal quotation marks omitted)).

Wilson also objected to some of the Bloods-related testimony elicited on cross-examination of defense expert Donald Romine, a former prison administrator. Romine testified on direct-examination that the prison system was capable of preventing Wilson from harming others. Romine was cross-examined as to whether members of the Bloods would be motivated to commit acts of violence in prison in order to raise their status. Romine was competent to testify about the nature of that threat, based on his long administrative experience at several prisons and in the Bureau of Prisons--experience that included examining prisoners' records to determine their threat level.

The district court did not abuse its discretion in allowing Geralds's and Romine's testimony regarding the Bloods. See United States v. Kaplan, 490 F.3d 110, 117 (2d Cir. 2007).

60

be the OG SI because he had put in sufficient "work." Geralds clarified for the jury that "work" meant violence, and that killing police officers would constitute this kind of work. Geralds also testified that in later conversations, Wilson enlisted Geralds's help in finding a woman who would bear his child, and in checking out the gang status of a fellow inmate.

Wilson objected on the ground that Geralds was acting as a government agent when he elicited these admissions, and that admission of Geralds's testimony regarding his prison conversations with Wilson therefore would violate Wilson's Sixth Amendment right to counsel. Massiah, 377 U.S. at 205-06 (holding that surreptitious interrogations after defendant's indictment conducted outside the presence of counsel violated defendant's right to counsel). A jailhouse informant is deemed to have conducted an interrogation in violation of a defendant's Sixth Amendment Massiah rights if the informant was acting as a "government agent" who "deliberately elicit[ed]" the incriminating information; information is only excluded if it is obtained as a result of the government's intentional efforts. United States v. Stevens, 83 F.3d 60, 64 (2d Cir. 1996) (internal quotation

61

marks omitted).

The district court denied Wilson's objection after a hearing:  "Based on Geralds' testimony at this hearing, I find that he did not act as a 'government agent' when he spoke with Wilson, that he did not 'deliberately elicit' any statements from Wilson, and that the Government made no 'intentional effort'" to obtain statements from Wilson through Geralds.  United States v. Wilson, 493 F. Supp. 2d 514, 515 (E.D.N.Y. 2007) (quoting Stevens, 83 F.3d at 64).

"The standard of review for evaluating the district court's ruling on a suppression motion is clear error as to the district court's factual findings, viewing the evidence in the light most favorable to the government, and de novo as to questions of law."  United States v. Rodriguez, 356 F.3d 254, 257 (2d Cir. 2004).  The sequence of events is as follows, viewing the evidence in the light most favorable to the government:  Geralds became a cooperator; in the course of cooperation, before Geralds or the prosecutors knew that Wilson and Geralds were in the same prison unit, Geralds identified Wilson as a gang member known to him, and was questioned by prosecutors about Wilson; Wilson learned that Geralds was housed nearby and initiated contact with him;

Geralds and Wilson had their conversation about Wilson's pretension to be the OG SI; Geralds reported this conversation to prosecutors, who instructed Geralds to "not get any information from Mr. Wilson"; in further conversations, Geralds and Wilson discussed topics "from girls to music [to] cars," and Wilson asked for help in finding a woman and in checking on the gang status of another inmate.

Even assuming that Geralds deliberately elicited information from Wilson in the first conversation (about OG SI), Geralds was not a government agent at that time.  More than a cooperation agreement is required to make an informant a government agent with regard to a particular defendant.  United States v. Birbal, 113 F.3d 342, 346 (2d Cir. 1997).  An informant becomes a government agent vis-a-vis a defendant when the informant is "instructed by the police to get information about the particular defendant."  Id.  This first prison conversation was initiated by Wilson, and Geralds was under no government influence.  True, the prosecutors had showed interest in Wilson in a meeting with Geralds before this conversation--and before Wilson or the prosecutors knew that Geralds would meet Wilson in prison--

but evincing interest did not amount to an instruction sufficient to make Geralds a government agent.  Cf. United States v. Henry, 447 U.S. 264, 270-71 & n.8 (1980) (holding that an informant was a government agent where the investigators were aware that the informant "had access" to the defendant and they "singled out" the defendant).

Further assuming arguendo that Geralds became a government agent after he reported the OG SI conversation-- when the prosecutors knew that Geralds had access to Wilson and had delivered information about him--Geralds's testimony still did not violate Wilson's Sixth Amendment rights. There is no evidence that Geralds did anything in the later conversations with Wilson but follow the government's instructions to "merely listen[]."  See Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In any event, the only damaging admission to which Geralds testified was Wilson's claim to OG SI status in the first conversation, at which point Geralds was not a government agent.  Geralds's testimony did not infringe Wilson's Sixth Amendment right to counsel.

**VI**

64

During summation, the prosecution made the following argument to the jury, of which the emphasized passage is challenged:

> Ronell Wilson up until the very moment that he addressed you last week has done everything he could to escape responsibility for his crimes. *He has an absolute right to go to trial, put the government to its burden of proof, to prove he committed these crimes, but he can't have it both ways. He can't do that, then say I accept responsibility.* [Defense objection overruled.] *And [say "]I'm sorry, only after you prove I did it.["]* That's not acceptance of responsibility. That is a manipulative criminal saying what he has to, saying what he knows you want to hear when it's in his interest to say it."

Def. App. at 868 (emphasis added). Wilson argues that this comment unconstitutionally burdened his Sixth Amendment right to a jury trial. We agree.[17]

Under the "unconstitutional conditions doctrine," "the government may not do indirectly what it cannot do directly." United States v. Oliveras, 905 F.2d 623, 627-28 & n.7 (2d Cir. 1990) (per curiam). The doctrine keeps the prosecution from "trench[ing] on [a] defendant's constitutional rights and privileges." United States v.

---

[17] Wilson also argues that he did in fact offer to plead guilty and that the prosecutors therefore impermissibly misled the jurors into thinking otherwise. Our constitutional holding obviates that dispute.

65

Parker, 903 F.2d 91, 98 (2d Cir. 1990). "The prosecution cannot use the defendant's exercise of specific fundamental constitutional guarantees against him at trial." Burns v. Gammon, 260 F.3d 892, 896 (8th Cir. 2001). For that reason, a statute cannot disallow the death penalty for those who plead guilty but allow it for those who exercise their right to a trial. United States v. Jackson, 390 U.S. 570, 581 (1968). By the same token, a capital-sentencing scheme cannot allow the jury to draw an adverse inference from constitutionally protected conduct such as a request for trial by jury; if the government invites the jury to find the existence of an aggravating factor based on "inferences from conduct that is constitutionally protected . . . for example . . . the request for trial by jury, . . . due process of law would require that the jury's decision to impose death be set aside." Zant v. Stephens, 462 U.S. 862, 885 (1983).

We maintain "a distinction between *increasing* the severity of a sentence for a defendant's failure to cooperate and refusing to grant *leniency*." United States v. Stratton, 820 F.2d 562, 564 (2d Cir. 1987) (emphasis added). Stratton itself illustrates the one-way ratchet: It is

66

permissible for a sentencing court to consider that, "if [the defendant] were willing to assist us to bring the other person to justice, I would find it very easy to be reasonable and lenient," id. (quoting Mallette v. Scully, 752 F.2d 26, 31 (2d Cir. 1984)), but it is unconstitutional to impose consecutive rather than concurrent sentences solely on account of the defendant's failure to cooperate, id. Similarly, the federal Sentencing Guidelines treat acceptance of responsibility (usually via a plea) as a basis for leniency, see U.S. Sentencing Guidelines Manual § 3E1.1 (2007), but do *not* provide a harsher sentence for failure to plead.

This distinction is the "only rule that recognizes the reality of the criminal justice system while protecting the integrity of that system." Mallette, 752 F.2d at 30. Sometimes the rule may be "difficult to apply," or even "somewhat illusory," Stratton, 820 F.2d at 564 (internal quotation marks omitted); but not in this case. In purpose and effect, the government used Wilson's demand for trial to evidence lack of remorse and refusal to accept responsibility, characteristics offered to undermine Wilson's defenses to a sentence of death. The government

also emphasized Wilson's lack of remorse as support for the aggravating factor of future dangerousness. See Def. App. at 604 ("What else tells you about the incredible danger that this man poses? . . . The fact that the defendant has absolutely, absolutely no remorse whatsoever for his actions."). In so doing, the prosecution contravened Zant, 462 U.S. at 885, and Jackson, 390 U.S. at 581, and crossed the line drawn in Stratton, 820 F.2d at 564.[18]

"Whether [a sentencing] differential is a reward for cooperation or a penalty for invoking a constitutional right depends on the benchmark--the 'normal' sentence that would be meted out if constitutional rights were not salient." United States v. Klotz, 943 F.2d 707, 710 (7th Cir. 1991). There is no doubt that the baseline sentence in this case is life without parole, and that a verdict of death is an

---

[18] As to Wilson's Sixth Amendment right, the dissent argues that Stratton is not germane because the prosecution's remark (about Wilson exercising his trial right) is located in the discussion of Wilson's mitigating evidence, and thus did not argue for aggravation on this ground. We disagree. The nature of the penalty phase, structurally, is to determine whether the sentence of life should be raised to a sentence of death. Furthermore, Wilson's decision to go to trial was used not only to undermine his proposed mitigator (acceptance of responsibility); it also was used to show depravity, which supported an inference of future dangerousness, a proposed aggravator.

68

increase in severity.  To achieve a death penalty, the government was required to prove the aggravating factors justifying death beyond a reasonable doubt to a unanimous jury.  See 18 U.S.C. §§ 3593(c), (e).  Wilson's constitutionally protected decision to go to trial was cited as a reason to sentence him to death, and thus to "enhance" what would otherwise be a life sentence.

The government relies heavily on United States v. Mikos, 539 F.3d 706, 718 (7th Cir. 2008), which observes: "If it is proper to take confessions, guilty pleas, and vows to improve one's life into account when deciding whether a murderer should be put to death--and it is unquestionably proper for the judge or jury to do so--then it must also be proper for the prosecutor to remind the jury when none of these events has occurred."  (internal citation omitted). Mikos then suggests that § 3E1.1 of the Sentencing Guidelines "institutionalize[s]" this practice, and that "in a capital case . . . what happens automatically as a result of § 3E1.1 must be argued for.  The two are equally appropriate."  Id.  We are unpersuaded.  The quoted language is arguably dicta, id. at 719 ("If error occurred in this penalty proceeding, it was harmless."); it conflicts with

69

earlier Seventh Circuit precedent, see United States v. Saunders, 973 F.2d 1354, 1362 (7th Cir. 1992) ("[U]nder the so-called unconstitutional conditions doctrine . . . a defendant may not be subjected to more severe punishment for exercising his or her constitutional right to stand trial."); and it misconstrues Section 3E1.1 of the Sentencing Guidelines, which does not contemplate increased punishment for a failure to cooperate.[19]

For these reasons, we conclude that the government unconstitutionally burdened Wilson's Sixth Amendment right to trial.[20] Because Wilson's Fifth Amendment rights were

---

[19] See Mikos, 539 F.3d at 722 (Posner, J., concurring in part and dissenting in part) ("[T]here is a difference between a defendant's arguing for leniency on the basis of his admitting to having committed the crime with which he is charged and the government's asking the jury to draw an inference of heinousness from his failure to admit that."). This distinction reflects the concerns that underlie this Court's decision in Stratton.

[20] The dissent accurately observes that United States v. Fell, 531 F.3d 197 (2d Cir. 2008) "goes largely unaddressed by the majority" in the discussion of Sixth Amendment error. Dissent at 9. The ground of distinction that renders Fell unhelpful here is that Fell's willingness to plead was put in issue by him, so that the government's argument was responsive. United States v. Fell, 531 F.3d 197, 221 (2d Cir. 2008) ("We believe the[ government's] arguments . . . were reasonable responses to Fell's use of [his offer to plead guilty].") Here, Wilson did not put in issue his decision to go to trial--he offered no proof (beyond his allocution) of his argument that he accepted

70

also unconstitutionally burdened (see Point VII) we consider harmlessness cumulatively (see Point VIII).

**VII**

At the start of the sentencing phase, defense counsel advised the court that Wilson wanted to read to the jury a statement of remorse in his own words, without taking the witness stand. On advice of counsel, the statement would omit any "evidentiary" discussion of the crime itself. The government objected on the grounds that the statement was to be unsworn and not subject to cross-examination.

Following a series of disputes concerning the permissible scope of Wilson's allocution,[21] Wilson read this

responsibility--and thus the government's response unconstitutionally burdened that protected decision.

[21] Wilson raises two arguments regarding the scope of his allocution. First, he contends that the district court abused its discretion by redacting the following: "It just hurted me to hear that young kid [Detective Andrews's son, Christian] & his brother Justin will never have they father there to be the father most men refused to be like my own. I would never wish this for nobody because I know how painful it is." Second, he argues that the prosecution unfairly exploited that ruling by citing to the jury Wilson's failure to specify the conduct for which he was claiming remorse (i.e., murdering the two detectives).

As to the first argument: Under the FDPA, the district court has the discretion to exclude evidence if the

statement of remorse to the jury:

> Good afternoon. I, Ronell Wilson, wrote a
> statement that I want to read to you, the jury. I
> want you to understand my deepest sorrow towards
> the victim[s'] family and friends. I have seen
> the pain that I have caused the family and friends
> of the victims and to my own family and friends.
> I know that the wives and children and loved ones
> are also victims.
>
> I would never wish this for anyone because I know
> how painful it is. So I cannot be remorse[less][22]
> and show no sympathy to these men's families and
> friends.

"probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury," 18 U.S.C. § 3593(c), or if it is so unreliable that it "might render a trial fundamentally unfair," United States v. Fell, 360 F.3d 135, 145 (2d Cir. 2004) (internal quotation marks omitted). The district court therefore excluded from the allocution, inter alia, "any arguments raised by the [prosecution] (other than their argument that Wilson lacks remorse for murdering Detectives Andrews and Nemorin)" or any reference to "the testimony of any witness, including members of the victims' families (who were sworn in and subject to cross-examination) . . . ." We review the district court's decision limiting the scope of Wilson's allocution for abuse of discretion. Fell, 531 F.3d at 219-20. Applying that standard, we find no error.

The second argument overlooks the district court's ruling *explicitly* allowing Wilson to allocute to his remorse for the specific crime of having murdered Detectives Andrews and Nemorin. Def. App. at 1315 (precluding Wilson from allocuting to "any arguments raised by the [prosecution] (*other than their argument that Wilson lacks remorse for murdering Detectives Andrews and Nemorin*.") (emphasis added). Therefore, we find no error here, either.

[22] The transcript shows the word as "remorseful," but this appears to have been a typographical error.

72

I am not good with words.  I wish I could explain myself more better, but I am not truly--but I am truly sorry for the pain I have caused them all. I know that I have caused a great deal of pain to them all and I say it again and again, I am so sorry.

I am sorry that I caused so much pain throughout my life to others, especially my family and the families of the victims.

I know that the victims' families may not accept my apology but I pray that God will give them all the comfort and strength that they need to move on from this tragedy.  I have the same prayer for my family also.

Thank you.

Before summations, Wilson consented to an instruction allowing the jury to consider that his statement of remorse was neither sworn nor subject to cross-examination, and that charge was ultimately given to the jury.  Wilson's request for the following no-adverse-inference instruction was denied:

[Y]ou may draw no inference whatsoever from the fact that the defendant has chosen not to testify at the sentencing phase of this trial.  He is entitled to make that choice and there may be many reasons for him having done so.  The fact that he did not testify is, quite simply, to play no part whatsoever in your decision-making at this stage.

In its summation, the prosecution properly pointed out that Wilson's allocution was unsworn and uncrossed, but then

73

went on to emphasize Wilson's decision not to testify (the problem wording is emphasized):

> I want to talk to you a minute about the statement itself. You may have noticed that when he made that statement, Ronell Wilson wasn't sitting up there on the witness stand under oath, subject to cross-examination. *He chose to do it from there (indicating). The path for that witness stand has never been blocked for Mr. Wilson, had that opportunity too. He chose, like many other things in this case, to do it that way.*
>
> *You may ask yourselves well, what more would we have if he took that stand, what would be the difference?* Well, we might have been able to ask him when did you come up with this? How did you come up with it? Why did you come up with it? Why now? Why now of all times are you sorry? We might be able to test the credibility of the statement, the veracity of it. You might have information that could help you decide if you need to believe it. Ronell Wilson didn't want that. He wanted to say it from there, ["]take my word for it now after all this, I'm sorry["].

Def. App. at 868 (emphasis added).

After summation, defense counsel argued that the prosecution had "suggest[ed that] he should have taken the stand and been under oath. . . . My concern is that the jury shouldn't come away with the misimpression that somehow the defendant has the burden of taking the stand in a capital case and be subjected to cross-examination. That's just not the defendant's burden." The defense requested a curative instruction--to be inserted in the charge that

74

explained how to evaluate the statement of remorse--that "it's not the burden of the defendant to take the stand or to be subjected to cross-examination." The government maintained that its argument was proper. The court instructed the jurors that, "[w]hen considering the defendant's statement of January 24, 2007, you may take into account that the defendant made the statement without being sworn in and without subjecting himself to cross-examination." But the court gave neither of the requested no-adverse-inference instructions.

Wilson concedes on appeal that it was within bounds for the prosecution to comment in summation that the allocution was not made under oath and was not subject to cross-examination. Wilson argues, however, that the allocution did not effect a waiver of his Fifth Amendment right and that the prosecution therefore violated that right by telling the jury that "[t]he path to that witness stand has never been blocked for Mr. Wilson." That approach accords with the view of some courts, which have distinguished between comments that focus on the fact that an allocution was unsworn and uncrossed (deemed permissible) and comments that emphasize the defendant's failure to testify (deemed

impermissible).  See, e.g., Depew v. Anderson, 311 F.3d 742, 750 (6th Cir. 2002); United States v. Martin Aguilar, No. 01-1367-cr (E.D.N.Y. Jan. 11, 2007); State v. Skatzes, No. 15848, 2003 WL 24196406, at *33 (Oh. App. Jan. 31, 2003). We consider, however, that this permeable line is ineffective for preserving the right; it is altogether too likely that a jury will naturally (and sensibly) equate testimony under oath subject to cross-examination with testimony from the witness stand.  We adopt a different approach, premised on waiver, a principle that inheres in the uncontroversial rule that prosecutors can emphasize that an allocution is unsworn and uncrossed.  We start with first principles.

It is settled that prosecutors may not comment adversely on a defendant's invocation of his Fifth Amendment privilege not to testify.  Griffin v. California, 380 U.S. 609, 615 (1965) ("[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.").  This protection extends to capital sentencing proceedings.  See Estelle v. Smith, 451 U.S. 454, 462-63 (1981) ("We can discern no basis to distinguish between the

76

guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."). To secure these protections, "the Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so." Carter v. Kentucky, 450 U.S. 288, 300 (1981).

"The test governing whether a prosecutor's statements amount to an improper comment on the accused's silence in violation of the Fifth Amendment looks at the statements in context and examines whether they naturally and necessarily would be interpreted by the jury as a comment on the defendant's failure to testify." United States v. Knoll, 16 F.3d 1313, 1323 (2d Cir. 1994) (internal quotation marks omitted). However, a defendant's conduct can result in a limited waiver of his Fifth Amendment rights against self-incrimination and against the drawing of an adverse inference from his invocation of that right. For example, a defendant who testifies on direct cannot claim Fifth Amendment immunity from cross-examination on matters that

his own direct testimony put into dispute.[23]  Brown v. United States, 356 U.S. 148, 155-56 (1958); see also Harrison v. United States, 392 U.S. 219, 222 (1968) ("A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives. . . ."); Lesko v. Lehman, 925 F.2d 1527, 1542 (3d Cir. 1991) (explaining that an adverse inference may be drawn "when the defendant has testified as to some facts concerning the crime charged, but has refused to testify as to other facts within his knowledge").  Limited waiver accommodates the need of both sides for "the opportunity to meet fairly the evidence and arguments of one another."  United States v. Robinson, 485 U.S. 25, 28, 33 (1988); see also id. at 28, 34 (holding that government's

---

[23] Wilson analogizes an unsworn, uncrossed allocution to a defendant's use of his prior out-of-court statement and cites cases that refuse to find waiver in such circumstances. See, e.g., Horne v. Trickey, 895 F.2d 497, 500-01 (8th Cir. 1990); Porter v. Estelle, 709 F.2d 944, 958-59 (5th Cir. 1983).  The analogy is inapt, because the type of allocution at issue here, read aloud to the jury by the defendant, is a close analog to testimony and does not sound like silence.  Accord Booth v. State, 507 A.2d 1098, 1114 (Md. 1986) ("[A]llocution is more like testimony than silence and for Fifth Amendment purposes is testimonial . . . ."), rev'd on other grounds, Booth v. Maryland, 482 U.S. 496 (1987), overruled by, Payne v. Tennessee, 501 U.S. 808 (1991).

argument that defendant "could have taken the stand and explained it to you, anything he wanted to," was permissible because it "fairly respond[ed] to an argument of the defendant").

Applying the principles of limited waiver articulated in these cases, we hold that an unsworn, uncrossed allocution constitutes a limited Fifth Amendment waiver that allows the prosecution to argue for an adverse inference from a defendant's failure to *testify* as to that to which he has *allocuted*. Accord Booth v. State, 507 A.2d 1098, 1114 (Md. 1986) (explaining that the defendant's allocution constitutes, "at a minimum, a waiver of any privilege to avoid comment by the prosecutor on the allocution"), rev'd on other grounds, Booth v. Maryland, 482 U.S. 496 (1987), overruled by, Payne v. Tennessee, 501 U.S. 808 (1991). Thus, Wilson's allocution constituted a limited waiver of his right under Griffin to be free from adverse comment on his failure to testify and of his right under Carter to a blanket jury instruction prohibiting the jurors from considering his silence.

Although Wilson's allocution effected a limited waiver of the Fifth Amendment rights he enjoyed under Griffin and

79

Carter--the waiver was limited.  The prosecution attempted conscientiously to focus solely on the subject matter of the allocution and to maintain that context.  Even so, there is something expansive about saying "[t]he path to that witness stand has never been blocked for Mr. Wilson," and a juror could think that "never" is a period that extends back to the guilt phase of the trial and extends as well to the full penalty phase rather than just to the reading of the allocution.  In any event, and despite his limited waiver, Wilson remained entitled to a Carter no-adverse-inference instruction upon request.

Neither request made by Wilson was wholly free from defect.  The charge that Wilson requested pre-summation was a fair statement of law at the time.  True, it did not take into account the adverse inference that may be drawn from the expression of remorse by allocution rather than by testimony; but that is doctrine clarified in this opinion.  The instruction that Wilson sought *post*-summation would have barred a permissible adverse inference from Wilson's failure to express remorse from the witness stand.

Nevertheless, the denial of *any* Carter instruction risked transforming Wilson's limited waiver into a complete

one, particularly in view of some wording in the government's summation.  The district court should have issued a variant of the <u>Carter</u> instruction that allowed the jurors to consider Wilson's failure to testify *as to the subject of his allocution*, but that forbid them from considering his failure to testify for any other purpose or as to any other part of the defense's case.[24]

We next consider whether this error combined with the Sixth Amendment error (see Point VI) requires us to vacate the death sentences.

**VIII**

---

[24] As to the Fifth Amendment error, the dissent contends that our whole argument of harm rests on a mere three words reflecting an unfortunate choice of tense. Dissent at 12-13.  A jurisprudence based on word-count would transform this area of law for the worse.  In any event, the three words ("has never been") are embedded in a pair of crucial, emphatic sentences, and drive the predicate:  "The path for that witness stand has never been blocked for Mr. Wilson, had that opportunity too.  He chose, like many other things in this case, to do it that way."  The dissent questions whether a jury would think (as we think) that "never" is a period that extends back "to the guilt phase . . . and extends as well to the full penalty phase." Majority at 80.  How far back, one wonders, *does* the dissent consider that "never" extends back?  The word never is a humble Anglo-Saxon word, but it is emphatic.  <u>See</u> Oxford English Dictionary (Draft rev. ed. June 2010) ("At no time or moment; on no occasion; not ever.").

81

Wilson has adequately preserved both his Sixth and Fifth Amendment claims; harmless error review therefore applies.  See Satterwhite v. Texas, 486 U.S. 249, 256 (1988).  Accordingly, we will vacate the sentences unless the "prosecution can prove beyond a reasonable doubt that a constitutional error did not contribute to the verdict."  Id.  Because there are two errors, we consider whether vacatur is required by these errors in the aggregate.  See United States v. Rahman, 189 F.3d 88, 145 (2d Cir. 1999) (per curiam) ("[T]he effect of multiple errors in a single trial may cast such doubt on the fairness of the proceedings that a new trial is warranted, even if no single error requires reversal.").

The prosecution cited two constitutional elections made by Wilson--to go to trial and not to testify--as reasons to reject two of Wilson's offered mitigators: acceptance of responsibility and remorse.  And the government then cited the lack of remorse as evidence of an aggravating factor: Wilson's future dangerousness.  See Def. App. at 604 ("What else tells you about the incredible danger that this man poses? . . . The fact that the defendant has absolutely, absolutely no remorse whatsoever for his actions."); Def.

App. at 885 ("Now, during jury selection, many of you talked about wanting to believe that someone who committed murder would wake up every day and feel sorry about it, feel some remorse about what he had done.  Well, Ronell Wilson is not that person.").

Moreover, the focus on Wilson's decision to elect a trial had an uncontrollable resonance for the jury.  After acknowledging Wilson's "absolute right to go to trial," the government suggested that if Wilson had accepted responsibility, he would not have "put the government to its burden of proof, to prove he committed these crimes."  Not incidentally, however, the burden thus placed on the prosecution to mount its case placed a counterpart burden on the jurors to sit through it.

These arguments were potent--*no juror* found that Wilson accepted responsibility or showed remorse, and *every juror* found that Wilson presented a risk of future dangerousness.

On these facts, it is hard to see how the government can prove that these errors were harmless.  Indeed, the government's emphasis on these arguments during summation suggests they were not harmless beyond a reasonable doubt.  See Clemons v. Mississippi, 494 U.S. 738, 753 (1990) (the

prosecution's reliance on a particular issue bears on whether error regarding that issue is harmless). And the district court acknowledged that lack of remorse and future dangerousness (as evidenced, in part if not in whole, by a lack of acceptance of responsibility) were among the most influential factors that moved the jury to return a verdict of death. That insight accords with experience, intuition, and research.[25] The prosecution recognized as much in this case. See Def. App. at 885 ("[D]uring jury selection . . . [m]ost of you talked about acceptance of responsibility and

---

[25] See, e.g., Riggins v. Nevada, 504 U.S. 127, 143 (1992) (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative. . . ."); United States v. Mikos, 539 F.3d 706, 724 (7th Cir. 2008) (Posner, J., concurring in part and dissenting in part) (citing studies and articles supporting this proposition); Michael A. Simons, Born Again on Death Row: Retribution, Remorse, and Religion, 43 Cath. Law 311, 322 (2004) ("The importance of a defendant's remorse in capital sentencing is well documented. Empirical studies of capital juries have demonstrated that a defendant's remorse (or lack of remorse) is one of the single most important factors in the jury's sentencing decision." (footnote omitted)); Theodore Eisenberg, Stephen P. Garvey, & Martin T. Wells, But was he sorry? The Role of Remorse in Capital Sentencing, 83 Cornell L. Rev. 1599, 1633 (1998) ("In short, if [South Carolina] jurors believed that the defendant was sorry for what he had done, they tended to sentence him to life imprisonment, not death."); William S. Geimer & Jonathan Amsterdam, Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases, 15 Am. J. Crim. L. 1, 51-53 (1987-88).

remorse and how important those things would be to you when you decide what punishment would be appropriate.").

The harm might have been mitigated if the jury could have relied on a Carter instruction given in the guilt phase. However, the district court's instructions in the sentencing phase implied that the no-adverse-inference principle articulated during the guilt phase affirmatively *did not apply* to the sentencing phase:

> [I]t is my responsibility to instruct you as to the law that governs this phase. . . . [I]t would be a violation of your oaths as jurors to base your sentencing decisions upon any view of the law other than that given to you in these instructions.
>
> Some of the legal principles that you must apply in this phase duplicate those you followed in reaching your verdict as to the guilt of this Defendant. Others are different. The instructions I am giving you now are a complete set of instructions about the law applicable to the penalty phase.

That "complete set of instructions about the law applicable to the penalty phase" omitted any no-adverse-inference principle.

In light of these considerations, we cannot say beyond a reasonable doubt that the effects of the two

constitutional errors were harmless.[26]  Accordingly, we
vacate the death sentences (only) and remand to the district
court for a new sentencing phase.

## IX

Applying well-established rules of law, we find that
Wilson's arguments addressed in this Point are meritless.
However, in a death penalty case we are statutorily obliged
to address all arguments in writing, and we do so here.  18
U.S.C. § 3595(c).

## A

Wilson asserts that in the penalty phase summations,
the prosecution castigated defense counsel for [i]
presenting the mitigating evidence, and [ii] shifting the
blame for the murders to the victims and others.  We will
reverse on the ground of prosecutorial misconduct only if

---

[26] The dissent finds no Sixth Amendment violation, and punts as to whether there was a violation of the Fifth Amendment.  We, therefore, do not join issue with the dissent on whether a Fifth Amendment error alone would be harmless.  Our analysis concludes only that the two errors-- each reinforcing and amplifying the other on the critical issues of remorse, acceptance of responsibility, and future dangerousness--cannot be found harmless beyond a reasonable doubt.

86

that misconduct caused "substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002) (internal quotation marks omitted). "In assessing whether prosecutorial misconduct caused 'substantial prejudice,' this Court has adopted a three-part test: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." Id. Here, misconduct (if any) could not be deemed severe. See United States v. Newton, 369 F.3d 659, 681 (2d Cir. 2004) (cautioning against "disproportionate emphasis [on] isolated incidents of alleged error"); Elias, 285 F.3d at 191 ("[T]he severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding."). Moreover, Wilson cannot show substantial prejudice: The jury charge directed broad consideration of mitigation factors, and the challenged comments did not bolster the government's aggravating factors or undermine Wilson's mitigating factors.

**B**

87

The district court instructed the jury that in order to decide that Wilson constituted a future danger (a non-statutory aggravating factor), it needed to find that "the defendant is *likely* to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others." (emphasis added). Wilson argues that the district court erred in rejecting his proposed jury instruction, which used both "likely" and "probable" to describe future dangerousness.

Since the two words are synonymous, the court's instruction viewed as a whole, see United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004), did not mislead the jury as to the correct standard, see People v. Randall, 711 P.2d 689, 692 (Colo. 1985) (defining "likely" as synonymous with "probable"); see also Fadiga v. Attorney Gen. of the U.S., 488 F.3d 142, 154 (3d Cir. 2007) ("[T]he proper inquiry is whether there is a 'reasonable likelihood' (or, synonymously, a 'reasonable probability'). . . ."). Wilson's own proposed instruction used "likely" and "probable" interchangeably. Wilson's related argument that the prosecutor's summation filled a supposed "void" as to the probability standard also fails, because any possible

88

prejudice from the prosecutor's summation was cured by the district court's proper instruction. See United States v. Salameh, 152 F.3d 88, 117 (2d Cir. 1998) (per curiam).

## C

Wilson contends that the jury was left to think that failure to deliver a unanimous verdict would allow the court to impose some other, lesser sentence. In support, Wilson cites the district court's refusal to charge that if the jury deadlocked, Wilson would be sentenced to life without the possibility of parole, coupled with two features of the special voting form, which [i] solicited a unanimous vote as to either death or life without the possibility of parole and [ii] for three of the capital counts, directed a jury that had not reached a unanimous vote on either sentencing option to vote on whether "some other sentence authorized by law shall be imposed." Wilson posits that a juror who would vote against the death penalty if a life sentence without the possibility of parole was the certain alternative might vote for death to avoid creating a deadlock that would allow Wilson's future release.

A capital defendant is not entitled to a jury

instruction on the effect of deadlock. Jones v. United States, 527 U.S. 373, 382 (1999) ("[T]he proposed instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role--when deliberations break down and the jury is unable to produce a unanimous sentence recommendation. . . . We have never suggested, for example, that the Eighth Amendment requires a jury be instructed as to the consequences of a breakdown in the deliberative process.").

To show that "the instructions and decision forms" confused the jury, a defendant must demonstrate that "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." Id. at 389-90 (internal quotation marks omitted). The adverse effect that Wilson posits was foreclosed by repeated instructions that Wilson would be sentenced either to death or to life in prison without the possibility of parole. There is no "reasonable likelihood" that the jury misunderstood the charge: The jury unanimously found proven the mitigating factor that Wilson would stay in prison for the rest of his life if he were not

90

sentenced to death.  See Boyde v. California, 494 U.S. 370, 380 (1990).

**D**

In a capital case, a defendant may present to the jury as a mitigating factor the fact that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death."  18 U.S.C. § 3592(a)(4).  The district court allowed Wilson to stipulate that other members of the Stapleton Crew who participated in the crime (Whitten, Green, and Bullock) had not been sentenced to death.  Wilson wanted the jury to learn that they had been sentenced to a term of years, not life in prison.  When that request was denied, Wilson withdrew this mitigating factor.

In the sentencing phase of a capital trial, this Court gives deference to the district court's decision on the admissibility of evidence and will not overrule it so long as it does not abuse its discretion by acting arbitrarily or irrationally.  United States v. Pepin, 514 F.3d 193, 202 (2d Cir. 2008).

The district court ruled that the stipulation provided all the relevant information required by the statute, and

that further evidence as to specific prison sentences would have low probative value, would confuse the jury, and would provoke or require trials within the trial concerning the other defendants, their cooperation, and their roles in the murders.  That decision was no abuse of discretion; the reasons adduced by the court are either explicitly permitted by the statute or have been accepted by this Court.  See 18 U.S.C. § 3953(c) ("[I]nformation may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."); Pepin, 514 F.3d at 206 (ruling that the district court's decision to exclude evidence of the defendant's prior crimes for fear that they would confuse the issues at hand by requiring a "diversionary trial within a trial" was not an abuse of discretion).

Even assuming that the jury would find the other defendants "equally culpable in the crime"--though it was Wilson who pulled the trigger--the probative value of additional specific sentences was small.  The jury had already learned, when two of Wilson's fellow gang members testified, that both Jacobus (who was with Wilson during the murders) and Diaz (who provided the murder weapon) were

92

sentenced to a minimum of 15-25 years imprisonment.  The defense attorney in summation pointed out that Jacobus could therefore be out of prison in twelve years.

**E**

Wilson argues that United States v. Whitley, 529 F.3d 150 (2d Cir. 2008), requires vacatur of his life sentence for Count Six (use of a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii)), as well as his life sentences for Counts Seven and Eight (causing death through the use of a firearm, 18 U.S.C. § 924(j)).  We hold that any error here is harmless and so we affirm as to this issue.

Section 924(c)(1)(A) provides, in relevant part:

> *Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law*, any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--
>
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A)(iii) (emphasis added).  The underlying predicate offense need not be a firearms offense:

93

"[t]he 'except' clause includes minimum sentences for predicate statutory offenses arising from the same criminal transaction or operative set of facts." United States v. Williams, 558 F.3d 166, 171 (2d Cir. 2009). Section 924(j) provides in turn that "[a] person who, *in the course of a violation of subsection (c)*, causes the death of a person through the use of a firearm, shall . . . if the killing is a murder . . . be punished by death or by imprisonment for any term of years or for life." 18 U.S.C. § 924(j) (emphasis added).

Capital sentences imposed under § 924(j) (Counts Seven and Eight) withstand Whitley. Section 924(j) is triggered by a "violation" of § 924(c). See 18 U.S.C. § 924(j). But § 924(c) has both a substantive component (describing criminal conduct) and a punishment component (setting out the range of permissible sentences for criminals who engage in that criminal conduct). A plain reading of § 924(j), therefore, indicates that a § 924(j) sentence is proper if the defendant violates the substantive component of § 924(c); whether that defendant can be properly *sentenced* under § 924(c) is of no moment. Since Wilson's § 924(c) conviction stands, so do his sentences under § 924(j). Any

94

error specific to Count Six would be harmless, due to the mandatory minimum sentences of life without the possibility of parole already in place.  See United States v. Rivera, 282 F.3d 74, 78 (2d Cir. 2002).  Therefore, we affirm as to this issue.

## CONCLUSION

For the foregoing reasons, we affirm the convictions, vacate the death sentences (only), and remand for a new sentencing phase consistent with this opinion.

DEBRA ANN LIVINGSTON, *Circuit Judge*, concurring in part and dissenting in part:

The majority concludes that the jury's five capital sentencing determinations must be set aside on two separate grounds, each involving the government's response to Ronell Wilson's claims, in mitigation, that he felt remorse for the murders of Detectives Andrews and Nemorin and that he accepted responsibility for his actions. First, the majority determines that about fifty allegedly errant words in the government's summation during the penalty phase unconstitutionally burdened Wilson's Sixth Amendment right to a jury trial. Second, it concludes that Wilson's Fifth Amendment rights were violated by three additional words in the summation, coupled with the trial court's failure to give a "no adverse inference" instruction pursuant to *Carter v. Kentucky*, 450 U.S. 288 (1981), albeit one modified for the special circumstances of this case. Because I conclude that there was no Sixth Amendment violation, and that any Fifth Amendment error that took place was indisputably harmless, I respectfully dissent from Parts VI, VII, and VIII of the majority's opinion, and from the judgment vacating the death sentences. I join in the remainder of the majority's opinion.

## I. The Penalty Phase of Wilson's Trial

Proper assessment of the purported errors on which the majority relies requires a fuller presentation of the background facts regarding Wilson's sentencing hearing. The penalty phase of Ronell Wilson's trial, conducted before the same jury that convicted him of five capital crimes, lasted for nine days, involved some forty witnesses, and encompassed nearly 1800 pages of trial transcript. The Federal Death Penalty Act required the government to prove at least one threshold culpability factor and one statutory aggravating factor beyond a reasonable doubt before Wilson was eligible for the death penalty. 18 U.S.C. § 3593(c), (e). The government relied on trial evidence

1

alone to prove four threshold culpability factors,[1] two statutory aggravating factors, and two additional non-statutory aggravating factors.[2] The government's penalty phase evidence thus focused on its remaining non-statutory aggravating factors: that Wilson had caused loss, injury, and harm to the victims and their families; and that he represented a continuing danger to the lives and safety of other persons.

The government called ten victim impact witnesses, among them Maryanne Andrews, Detective Andrews's ex-wife; sixteen year old Christian Andrews, one of Detective Andrews's two sons; Rose Nemorin, Detective Nemorin's widow and the mother of his three children; and Detective Nemorin's sister, Marie-Jean Nemorin. The government introduced an additional seventeen witnesses and many exhibits attesting to Wilson's violent past, which began early in childhood, as well as his ongoing membership and leadership role in the Bloods and his continuing violent behavior in custody after being arrested for the murders of Detectives Andrews and Nemorin.

The Federal Death Penalty Act provides that the defense may, if it wishes, ask the jury during

---

[1] These four factors were: (1) that Wilson "intentionally killed [his] victim[s]"; (2) that he "intentionally inflicted serious bodily injury that resulted in the death of [his] victim[s]"; (3) that he "intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim[s] died as a direct result of the act"; and (4) that he "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person . . . such that participation in the act constituted a reckless disregard for human life and the victim[s] died as a direct result of the act." 18 U.S.C. §§ 3951(a)(2)(A)-(D).

[2] The two statutory aggravating factors relied on by the government were that Wilson committed the offenses for "pecuniary gain," 18 U.S.C. § 3592(c)(8), and that he "intentionally killed . . . more than one person in a single criminal episode", *id.* § 3592(c)(16). The two non-statutory aggravating factors for which the government relied on trial evidence were: (1) that Wilson murdered two law enforcement officers during the course of their official duties, and that this factor tended to support imposition of the death penalty; and (2) that he faced contemporaneous convictions for other serious acts of violence charged in the counts in the indictment on which he had been convicted.

2

the penalty phase to find specific mitigating factors, which must be shown by a preponderance of the evidence. *Id.* § 3593(c). Wilson identified eighteen such factors for the jury to consider. Wilson presented thirteen witnesses during his defense case, including his mother, Cheryl Wilson; his father, Robert Earl Barnes; and his sister, Depetra Wilson. The defense also introduced numerous exhibits, including dozens of photographs of Wilson as a child and many documents depicting aspects of his troubled upbringing, which was the principal focus of the defense's mitigation case. Other defense evidence purported to show that Wilson had adjusted to federal prison and would not be a danger in the future if spared the death penalty. Without taking the stand, Wilson himself read a prepared, unsworn statement to the jury that expressed remorse for his crimes.[3]

At the close of the evidence, the jurors were instructed that they were called upon "to make a unique, individualized judgment about the appropriateness of imposing the death penalty." Tr.

---

[3] The full text of the statement reads as follows:

> Good afternoon. I, Ronell Wilson, wrote a statement that I want to read to you, the jury. I want you to understand my deepest sorrow towards the victim's family and friends. I have seen the pain that I have caused the family and friends of the victims and to my own family and friends. I know that the wives and children and loved ones are also victims.
> I would never wish this for anyone because I know how painful it is. So I cannot be remorseful and show no sympathy to these men's family and friends.
> I am not good with words. I wish I could explain myself more better [sic], but I am not truly – but I am truly sorry for the pain I have caused them all. I know that I have caused a great deal of pain to them all and I say it again and again, I am so sorry.
> I am sorry that I caused so much pain throughout my life to others, especially my family and the families of the victims.
> I know that the victims' families may not accept my apology but I pray that God will give them all the comfort and strength that they need to move on from this tragedy. I have the same prayer for my family also. Thank you.

Tr. 1501.

3

1743. Each juror was instructed to weigh the aggravating factors that all jurors had agreed on unanimously against any mitigating factors that the individual juror believed to be present. The jurors were then instructed to determine whether they unanimously concluded that the aggravating factors sufficiently outweighed any mitigating factors or, in the absence of mitigating circumstances, whether the aggravating factors by themselves justified a sentence of death. *Id.* at 1741. Wilson's jury was specifically instructed that "no jury is ever required to impose the death penalty" and that the jury may decline to do so "without giving a reason for that decision." *Id.* Urged by the court to give "careful and thorough consideration to all the evidence," *id.* at 1724, the jurors deliberated for over a day and half.

The jury agreed unanimously that the government had established each of its four threshold culpability factors and the six aggravating factors upon which it relied beyond a reasonable doubt. The jurors also agreed unanimously that Wilson had established thirteen mitigating factors by a preponderance of the evidence, and that one additional factor was present which the jury itself identified.[4] No juror concluded that Wilson had established, as he attempted, that he felt remorse

---

[4] The jury unanimously found in mitigation that (1) Wilson was twenty years old on the date of the crimes, (2) if not sentenced to death, Wilson would be incarcerated "for the rest of his life in prison without possibility of release or parole," (3) Wilson's parents were substance abusers "which resulted in poor parenting, an unstable and chaotic living environment, and separation of his family," (4) at age twenty-one months, Wilson was hospitalized for over two weeks after contracting bacterial meningitis, (5) Wilson was exposed to drugs and violence as a child and adolescent, (6) Wilson grew up in "poverty and deprivation," (7) during his childhood, Wilson "was admitted to hospitals on at least four occasions for psychiatric care," (8) throughout his childhood, Wilson was "prescribed medication by mental health professionals," (9) Wilson had a history of depression, (10) Wilson performed "well below grade level in school," (11) Wilson was placed in Special Education classes, (12) Wilson's poor performance in school was "affected by negative influences in his home life," and (13) Wilson had a "loving relationship with his family members, who [would] suffer grief and loss if he [were] executed." Verdict Form at 13-14, App'x at 1392-93. The jury also unanimously identified as an additional mitigating factor that Wilson "was possibly subject to peer pressure." *Id.* at 15. An additional eleven jurors

4

for his crimes, that he had accepted responsibility for them, or that he had adjusted well to federal prison. The jury unanimously voted to sentence Wilson to death on each of the five capital counts.

## II. Wilson's Sixth Amendment Claim

Wilson presented as mitigating factors during the penalty phase that he "had take[n] responsibility for his actions" and that he "ha[d] remorse for the murder[s] of Detectives Andrews and Nemorin." Verdict Form at 15, App'x at 1394. The principal evidence – indeed, the only evidence – that Wilson offered in support of these mitigating factors was the prepared, unsworn statement that he read to the jury without taking the stand. In it, Wilson claimed to be "truly sorry" for the pain he had caused, and he expressed his "deepest sorrow towards the victim's [sic] family and friends." Tr. 1501. The majority concludes that the government unconstitutionally burdened Wilson's Sixth Amendment right to a jury trial in challenging the credibility of this allocution during its summation. Respectfully, I disagree.

The government's allegedly improper words came not in the principal part of its summation, which addressed the evidence supporting each of the aggravating factors on which the government relied, but in that portion of the summation discussing the mitigating factors that Wilson urged to be present. The majority focuses solely on the language in italics, which reads in its broader context as follows:

> Ronell Wilson takes responsibility for his actions. Ronell Wilson has remorse for the murders of Detective Andrews and Nemorin. Did Ronnell Wilson show remorse after he killed Detective Andrews and when he turned the gun on Detective Nemorin, killed him as he begged for his life? . . . From the moment of

concluded that "[d]uring his early childhood, Ronell Wilson was exposed to an unsafe and unsanitary home environment," and three jurors found that Wilson's "scores on standardized intelligence tests are below average." *Id.* at 13-14.

those murders up to the start of this trial, did you hear any evidence, is there any evidence in the record of remorse or acceptance of responsibility? There's none.

Ronell Wilson up until the very moment that he addressed you last week has done everything he could to escape responsibility for his crimes.

*He has an absolute right to go to trial, put the government to its burden of proof, to prove he committed these crimes, but he can't have it both ways. He can't do that, then say I accept responsibility. . . . And [say "]I'm sorry, only after you prove I did it.["]* That's not acceptance of responsibility. That is a manipulative criminal saying what he has to, saying what he knows you want to hear when it's in his interest to say it.

The timing of his statement alone should tell you it's nothing more than a self-interested selfish man trying to save his own skin.

Tr. 1637-38.

The majority contends that this language – which explicitly states that Wilson had an "absolute right to go to trial" – nevertheless unlawfully burdened his Sixth Amendment right to jury trial by using "Wilson's constitutionally protected decision to go to trial . . . as a reason to sentence him to death." (Maj. Op. at 69.) This contention, however, simply mischaracterizes the government's summation. The government did not, as the majority contends, "cite[] as a reason to sentence him to death" that Wilson had elected to go to trial. (*Id.*) Instead, the government appropriately responded to Wilson's mitigation evidence.

The challenged comments occurred in response to Wilson's endeavor to persuade the jury that he had accepted responsibility for his actions, and that in light of this *mitigating* factor – a factor *he placed before the jury* – a sentence of death was not justified. The government did not, as the majority contends, seek to "characterize . . . the request for trial by jury as an aggravating circumstance," *Zant v. Stephens*, 462 U.S. 862, 885 (1983) (citation omitted) – a reason "to sentence [Wilson] to death." (Maj. Op. at 69.) Instead, it sought only to draw into question the credibility of Wilson's late-in-coming expression of remorse, which Wilson proffered as a basis for concluding

6

that the government's evidence in aggravation did not justify the multiple death sentences for which he was eligible.[5]

*United States v. Stratton*, 820 F.2d 562 (2d Cir. 1987), on which the majority relies, is therefore inapplicable. *Stratton* recognized a distinction between "increasing the severity of a sentence for a defendant's failure to cooperate," which is prohibited, and "refusing to grant leniency," which is not. *Stratton*, 820 F.2d at 564. But *Stratton* would only be relevant here, to the extent relevant at all, if the government had urged the jury to consider Wilson's exercise of his jury trial right as a reason to sentence him to death. Again, this is not what the government did. The prosecutor's remarks came not in his discussion of aggravating factors, but in his examination of the mitigating evidence put forward by Wilson, and in the context of explaining why this evidence should not be credited.

---

[5] The majority also appears to contend that the jury's consideration of the future dangerousness aggravator was somehow tainted because Wilson's lack of remorse was cited to show his future dangerousness. (Maj. Op. at 68 & n.18, 82.) This argument is made despite the fact that Wilson's decision to go to trial was never cited as a reason to find this aggravating factor. The jury instructions permitted the jury to consider lack of remorse as evidence of future dangerousness; the defense did not object to this language below, the majority does not state that allowing this consideration was error in and of itself, and it would be perfectly logical for the jury to conclude that one who lacks remorse for multiple murders could be more likely to be a danger in the future. Moreover, even accepting (as I do not) the majority's argument regarding "taint," the majority concludes that this supposed Sixth Amendment error was not harmless only in light of the Fifth Amendment error it also cites: "Our analysis concludes only that the two errors – each reinforcing and amplifying the other on the critical issues of remorse, acceptance of responsibility, and future dangerousness – cannot be found harmless beyond a reasonable doubt." (Maj. Op. at 87 n.26.) The prosecutor, however, cited *neither* Wilson's decision to go to trial nor his decision not to testify as evidence of dangerousness. Furthermore, as explained *infra*, in light of Wilson's waiver of his Fifth Amendment right as to the subject of his remorse (*a waiver that the majority agrees took place*) the jury was entitled to draw an adverse inference as to this subject from Wilson's decision not to take the stand. Thus, even apart from the overwhelming evidence of future dangerousness that would render any supposed "taint" as to dangerousness indisputably harmless, the Fifth Amendment error on which the majority relies to conclude that its supposed Sixth Amendment error was not harmless in no way "reinforc[ed]" or "amplif[ied]" this supposed error.

7

The prosecutor's comment, to the effect that the allocution lacked credibility as a statement of remorse because it came only when Wilson faced punishment for his crimes, was entirely proper. It is both natural and irresistible for a jury, in evaluating the sincerity of a statement of contrition, to note when it comes only at the point a defendant is seeking to avoid the maximum penalty and when it is utterly devoid of corroboration. In an analogous situation, the Supreme Court has indicated that prosecutorial comment pointing these facts out to the jury impairs no constitutional rights. *See Portuondo v. Agard*, 529 U.S. 61, 67-68 (2000). In *Portuondo*, the Supreme Court determined that it did *not* unlawfully burden a defendant's Sixth Amendment rights to be present and to confront the witnesses against him for a prosecutor to comment, in summation, on the opportunity that the exercise of these rights provided the defendant to tailor his testimony in light of the government's case. The Court noted that "it is natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to have in mind and weigh in the balance the fact that he heard the testimony of all those who preceded him." *Id.* Prohibiting the prosecutor from making this point, as the majority would do in this case, is unjustifiable: to do so "either prohibits inviting the jury to do what the jury is perfectly entitled to do; or it requires the jury to do what is practically impossible." *Id.* at 68.

This case is thus substantially *less* difficult than *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008), in which the Seventh Circuit determined that the government was entitled to rely on the defendant's supposedly remorse-free demeanor in court – in essence, on his decision to go to trial and remain silent there – to prove an *aggravating* factor: that the defendant had no remorse for his crimes. The majority criticizes *Mikos*, but the Seventh Circuit's analysis is wholly apt to explain why the remarks at issue here were proper:

[The defendant] fought every charge every step of the way. That was his right, but in the process he showed no remorse, compared with a person who conceded some culpability . . . If it is proper to take confessions, guilty pleas, and vows to improve one's life into account when deciding whether a murderer should be put to death – and it is unquestionably proper for a judge or jury to do so, *see Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) – then it must also be proper for the prosecutor to remind the jury when none of these events has occurred.

*Mikos*, 539 F.3d at 718.

In truth, this case is quite akin to *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008), which goes largely unaddressed by the majority. The defendant in *Fell* introduced evidence during the penalty phase of his capital trial that he had offered to plead guilty in exchange for a sentence of life imprisonment without parole – evidence he said was relevant to establishing that he had accepted responsibility for his actions. Sentenced to death, Fell challenged the government's summation comments to the effect that "if [Fell] wanted to plead guilty, he could have pled guilty":

Let's move on to the next [mitigating] factor: Donald Fell offered to plead guilty to kidnapping and murder[] . . . knowing that the law requires a sentence of life imprisonment without the possibility of release and he has maintained that offer to this day.

Ladies and gentlemen, the judge instructed you. You know the law. Life imprisonment without the possibility of release is the minimum sentence that Donald Fell faces for kidnapping with death resulting. It's the minimum sentence. When he offered to make that plea, he knew the evidence against him was overwhelming. . . . .

. . . .

Ladies and gentlemen, we had to try to convict him. If he wanted to plead guilty, he could have pled guilty. We had a guilt phase in this case, ladies and gentlemen. We put on our case. We met our burden. We proved it. And now we are here to decide what is the just sentence. The minimum sentence? Or the death Sentence?

Trial Tr. at 50, *United States v. Fell*, No. 01-12 (D. Vt. July 13, 2005). This Court determined that the government's remarks constituted a reasonable response to Fell's evidence in mitigation and that "[n]o error occurred." *Id.* at 221.[6]

Both Fell and Wilson exercised their constitutional right to go to trial. Both thereafter sought to persuade the jury that they had accepted responsibility, and that this was a factor in mitigation that the jury should take into account. Fell attempted to do so by showing that he was willing to accept punishment short of death, Wilson with his statement of contrition. The jury in each case could have considered this evidence and found it persuasive. At the same time, however, the government was entitled to point to reasons that jurors should not take this course. *Cf. Portuondo*, 529 U.S. at 68; *United States v. Robinson*, 485 U.S. 25, 32 (1988) (noting that "where . . . [a] prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel," the Fifth Amendment is not violated). It is thus wholly irrelevant that *Fell* is distinct from this case, as Wilson and the majority contend, because Wilson, unlike Fell, introduced no evidence that he had offered to plead. (Maj. Op. at 70 n.20.)

---

[6] The prosecutor had also argued at the guilt phase in *Fell* that:

> [D]efense counsel . . . told you in his opening statement that Donald Fell accepted responsibility for what he did. But that's not entirely true because as the judge told you on the first day of trial Donald Fell has pleaded not guilty. And because he pleaded not guilty a jury must find whether or not the Government can introduce evidence beyond a reasonable doubt to overcome the presumption of innocence that the law provides to Donald Fell.
> . . . .
> [D]efense counsel also said that Fell accepts responsibility for what he did. But he pleaded not guilty. And that's why we're here. . . .

*Fell*, 531 F.3d at 220 n.13.

10

In Fell's case, the prosecutor legitimately argued that an offer to plead guilty in exchange for the minimum penalty authorized for one's conduct does not demonstrate acceptance of responsibility. *Fell*, 531 F.3d at 221; *see also* Br. of Appellant at 79, *Fell*, 531 F.3d 197 (noting that the plea offer was introduced in an attempt to demonstrate acceptance of responsibility as a mitigating factor). It was in that context that the prosecutor stated, "we had to try to convict him. If he wanted to plead guilty, he could have pled guilty. We had a guilt phase in this case, ladies and gentlemen. We put on our case. We met our burden." In Wilson's case, the government argued that a statement of contrition that came at the last minute and was uncorroborated by any other evidence was not worthy of belief. It was in that context that the prosecutor said, "[Wilson] has an absolute right to go to trial, put the government to its burden of proof, to prove he committed these crimes, but he can't have it both ways." In neither case did the prosecution urge the jury to sentence the defendant to death because he went to trial and in neither case were the defendant's Sixth Amendment rights violated. There was no error here, much less error requiring vacatur.

### III. Wilson's Fifth Amendment Claim

Although Wilson's Fifth Amendment argument is marginally more substantial, it is doubtful any error occurred and certain that if there was error, it was harmless. The issue here concerns the Fifth Amendment consequences of Wilson's election to offer his statement of remorse but not to open himself up for cross examination with regard to it. The majority first concludes that the introduction of such a statement effects at least "a limited Fifth Amendment waiver that allows the prosecution to argue for an adverse inference from a defendant's failure to testify as to that to which he has allocuted." (Maj. Op. at 79 (emphasis omitted).) The majority next determines that *Carter v. Kentucky*, 450 U.S. 288 (1981), nevertheless entitles the defendant in such a situation to a

11

modified adverse inference instruction directed at matters other than those to which the defendant allocuted, and that the failure to give such an instruction, coupled in this case with the prosecutor's use of three errant words (essentially a wrong choice of verb tense) in referring to the defendant's decision not to take the stand, requires vacatur. With regard to the second determination, I respectfully disagree.

I, like the majority, "start with first principles." (Maj. Op. at 76.) Wilson was entitled to the protections of the Fifth Amendment during the penalty phase of his trial, meaning that he had a right not to testify and that the government could not use his silence against him, at least "with regard to factual determinations respecting the circumstances and details of the crime." *Mitchell v. United States*, 526 U.S. 330, 328 (1999). The Supreme Court has not yet determined whether silence in this setting properly "bears upon the determination of a lack of remorse." *Id*. at 330. Because Wilson did not remain silent at his sentencing proceeding, this open question need not be answered here.

I agree with the majority that Wilson's decision to speak to the jury constituted a waiver of his Fifth Amendment rights with regard to the subject matter of his allocution, and thus that the prosecution was permitted, as the majority states, "to argue for an adverse inference from [the] defendant's failure to *testify* as to that to which he . . . *allocuted*." (Maj. Op. at 79.) Given this determination, the majority rightly finds wholly legitimate the government's argument in summation that if Wilson had taken the stand, the sincerity of his allocution could have been better assessed. Indeed, because it accepts that Wilson waived his Fifth Amendment rights with regard to the allocution, the majority finds Fifth Amendment fault today with but *three words* in the government's summation:

I want to talk to you a minute about the statement itself. You may have noticed that when he made that statement, Ronell Wilson wasn't sitting up there on the witness stand under oath, subject to cross-examination. He chose to do it from there (indicating). The path for that witness stand *has never been* blocked for Mr. Wilson, had that opportunity, too. He chose, like many other things in this case, to do it that way.

You may ask yourselves well, what more would we have if he took that stand, what would be the difference? Well, we might have been able to ask him when did you come up with this? How did you come up with it? Why did you come up with it? Why now? Why now of all times are you sorry? We might be able to test the credibility of the statement, the veracity of it. You might have information that could help you decide if you need to believe it. Ronell Wilson didn't want that. He wanted to say it from there, take my word for it now after all this, now I'm sorry.

Tr. 1638.

The subtlety of this error cannot go unremarked. For it is indeed the difference between "was not" and "has never been" on which the majority relies. By the majority's own holding today, the government was fully entitled to argue that "[t]he path [to] that witness stand *was not* blocked," and that Wilson's decision not to take the stand to testify to his remorse was a reason to doubt its credibility. The majority contends, somewhat tepidly, that tense makes a difference, and that a juror hearing "has never been" might think "that 'never' is a period that extends back to the guilt phase . . . and extends as well to the full penalty phase." (Maj. Op. at 80.) But the government *made no argument* that the defendant's decision not to take the stand was relevant to anything other than the credibility of his allocution. So the only possible error must boil down to three errant words.

This is a slim reed indeed on which to hang a constitutional infirmity meriting the vacatur of five capital sentences rendered by jurors who, between the trial and the penalty phase, devoted over three weeks to hearing testimony in this case. The majority knows as much. Indeed, it concedes that the prosecution "attempted conscientiously to focus solely on the subject matter of the allocution." (Maj. Op. at 80.) It states only – and again tepidly – that "[e]ven so, there is something

13

expansive" about saying "has never been." (*Id.*)  It then hurriedly drops the subject, moving on to discuss the district court's failure to give a modified *Carter* instruction – the real heart of the problem.

*Carter v. Kentucky* held that a trial court has a constitutional obligation, upon request, to instruct a trial jury that no adverse inferences are to be drawn from a defendant's election not to take the stand – in essence, that it may not treat the defendant's silence as substantive evidence of his guilt.  *Carter*, 450 U.S. at 305; *see also Robinson*, 485 U.S. at 32 (noting that the Fifth Amendment prohibits the judge and prosecutor from suggesting to the jury that silence may be treated as evidence of guilt).  The Supreme Court has never expressly held that this obligation extends to the sentencing phase of a criminal proceeding, much less that it applies in a situation in which the defendant has waived his Fifth Amendment rights, at least with regard to the subject matter of an allocution he has introduced.  I will assume for now, with the majority, that Wilson was entitled to an instruction that the jury should not draw any adverse inference from his decision to remain silent with regard to matters other than his alleged feelings of remorse.  And I will pass over, as the majority also does, that Wilson never asked for such a "modified adverse inference" instruction – the only instruction that could have been appropriate in the context of this case – and that it is not our normal practice in such circumstances to afford relief.  *See United States v. Desinor*, 525 F.3d 193, 198 (2d Cir. 2007) (noting that judgment will not be reversed based upon the denial of a requested instruction where the instruction requested was not legally correct or was not supported by an adequate basis in the record).

The majority concludes and I agree that harmless error analysis is appropriate in the context of *Carter* error.  *See, e.g., United States v. Soto*, 519 F.3d 927, 930-31 (9th Cir. 2008) (holding that

14

failure to give *Carter* instruction is subject to harmless error analysis); *United States v. Brand*, 80 F.3d 560, 568 (1st Cir. 1996) (same); *Hunter v. Clark*, 934 F.2d 856, 860 (7th Cir. 1991) (en banc) (same); *United States v. Ramirez*, 810 F.2d 1338, 1344 (5th Cir. 1987) (same). It is here, however, that we again part ways. Any error that resulted from the government's errant three words ("has never been"*)* and the district court's failure to give a modified *Carter* instruction (one that was never requested) was harmless beyond a reasonable doubt. *See United States v. Hasting,* 461 U.S. 499, 508-09 (1983) ("[I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless"); *see also Satterwhite v. Texas*, 486 U.S. 249, 256 (1988). This case thus falls well short of presenting any circumstances that warrant vacatur of the jury's work, even assuming that error occurred.

First, as already noted, the government never argued that Wilson's decision not to take the stand should be used by the jury to make factual determinations favorable to the government with regard to anything except for Wilson's allocution – the matter that the majority concludes was properly the subject of an adverse inference. This is significant because *Carter* itself recognized that the instruction it requires is prophylactic. *Carter*, 450 U.S. at 305. In fact, it is a prophylactic instruction "to protect the prophylactic rule that the prosecutor cannot ask a jury to draw an adverse inference from the defendant's failure to testify which in turn protects the defendant's actual constitutional right to refuse to testify." *Hunter*, 934 F.2d at 864. It is thus "at least two steps removed from the constitutional privilege," and "[n]either giving nor withholding the instruction has a certain, powerful, effect on the jury's work." *Id*. at 865-66 (Easterbrook, *J.*, concurring).[7] The

---

[7] Indeed, as Judge Easterbrook noted, "[i]nforming the jurors about [the defendant's decision to remain silent] may remind them of an inference they otherwise would not have drawn, so a defendant might oppose the giving of such an instruction." *Hunter*, 934 F.2d at 865.

15

Supreme Court in *Carter* determined that requiring such an instruction, upon request, guards against the danger that an unguided jury might use a defendant's silence as evidence of his guilt. *Carter*, 450 U.S. at 301. The failure to give such an instruction, however, does not mean that this injury has occurred. Even assuming, then, that a modified *Carter* instruction was appropriate here, the absence of any direct argument from the government that Wilson's silence be used in an unlawful manner weighs strongly against the conclusion that the failure to give such an instruction was harmful.

The jury's own determinations, moreover, strongly suggest that it did not draw any inference adverse to Wilson with regard to matters other than his statement of remorse. As previously noted, the jury unanimously found that Wilson had established *thirteen* of the eighteen mitigating factors he put forward and, indeed, it identified an additional mitigating factor not even cited by the defense. The jury thus broadly accepted Wilson's evidence of a troubled childhood and difficult time in school – that he had grown up in poverty and deprivation, for instance, that his parents were substance abusers, that he was exposed to drugs and violence as a child, that he performed well below grade level in school and had a history of depression. Eleven jurors found, in addition, that Wilson had been exposed to an unsafe and unsanitary home environment, and three found that his scores on standardized tests were below average. Indeed, the jury unanimously rejected only his claims that he accepted responsibility and felt remorse (the two mitigators *about which he allocuted and that were properly the subject of an adverse inference*) and that he had adjusted well to federal prison – a final claim in mitigation that was simply not credible, in light of the government's evidence of future dangerousness.

The evidence establishing the government's aggravating factors, moreover, was overwhelming. The district court itself said, in sentencing Wilson, that "Ronell Wilson's guilt has

been proved not merely beyond a reasonable doubt, but beyond all doubt." Transcript of Sentencing Imposition, Mar. 29, 2007 ("Mar. 29 2007 Tr."), at 29. Indeed, the evidence presented at trial proved four of the six aggravating factors before the penalty phase even began.[8] The picture this evidence painted, moreover, was itself devastating to Wilson's position that a death sentence could not be justified.

Thus, the trial evidence showed that before these murders took place, Wilson discussed the possibility with his confederates that the man he intended to rob, Detective Nemorin, might be a police officer, and that Wilson might have to shoot him. On the day of the crimes, as he set his plan in motion, Wilson expressed concern that he was being followed, and that there were undercover police vehicles in the vicinity. Minutes later, Wilson climbed into the back seat of the undercover officers' car, pulled out the .44 caliber revolver he was carrying, and shot without warning Detective Andrews, who had accompanied Nemorin to meet with Wilson that day, in the back of the head. Wilson then shot Nemorin, again in the head, as the detective pleaded for his life. At Wilson's direction, Wilson and his confederate, Jessie Jacobus, searched the bodies, looking for money, before dumping them in the street and driving off in the undercover officers' car. When Jacobus asked Wilson why he had killed the men, Wilson said simply, "I don't give a fuck about nobody." Tr. 378. The jury finally heard evidence that at the time of his arrest, two days after the executions of Detectives Andrews and Nemorin, Wilson, whose nickname is "Rated R," was carrying rap lyrics he had written that celebrated violence and that could have been interpreted to refer to the crimes:

> Come teast Rated U better have dat vest and Dat Golock/leave a 45 slogs in da back

---

[8] The government relied on its evidence at trial to demonstrate that Wilson committed the murders for pecuniary gain, that he murdered more than one person in a single criminal episode, that he faced contemporaneous convictions for other serious acts of violence, and that he murdered law enforcement officers during the course of their official duties.

of ya head cause u cause I'm getin dat Bread I ain't goin stop to Im dead/When I getin dat money/ and when y say Rated don't forget da "R."

Gov't Ex. 15.01.

The district court stated in pronouncing sentence that "Wilson's allocution was not convincing." Mar. 29, 2007 Tr. at 33. It must have seemed weak, in light of the cold-blooded character of Wilson's crimes, his behavior thereafter, as well as his many additional acts of violence, both before and after the murders of the detectives. During the penalty phase, the jury learned from three of his victims that Wilson, as a young teenager, had repeatedly assaulted other children – in one case, attacking a 13-year old on a city bus and breaking his jaw in the course of robbing him. There was evidence of a fight in Times Square with a man Wilson had attempted to extort when both were prison inmates – a fight in which Wilson slashed the man in the face in front of a crowd, leaving a wound that required 300 stitches to close. Additional evidence went to violence in custody – to assaults on corrections officers, to fist fights with other inmates. There was evidence that Wilson believed he deserved "OG status" within the Bloods – the highest status, reserved for those who have committed the most acts of violence on behalf of the gang. There was evidence that Wilson used his position in the Bloods to incite other inmates to commit violence. The jury found beyond a reasonable doubt that Wilson represented a continuing danger to others, and that he was likely to commit acts of violence again. The court at sentencing stated its conclusion that Wilson "is capable of committing extreme acts of violence without warning or provocation," Mar. 29, 2007 Tr. at 35, and it characterized the proof in support of the jury's future dangerousness finding as "overwhelming," *id.* at 34.

So, too, was the evidence that Wilson's crimes resulted in loss to the victims, their families,

and to others. The district court observed in pronouncing sentence:

> Those of us when we heard the Detectives' family members testify will never forget Christian Andrews, Detective Andrews' older son, recounting his daily chess games with his father, or their annual family trips to Universal Studios in Florida. Nor will we ever forget Marie-Jean Nemorin, Detective Nemorin's sister, explaining how she gave her baby brother the nickname Tichou, which means little sweetheart[,] or Rose Nemorin, Detective Nemorin's widow, describing how their three children now celebrate Father's Day in a cemetery where they hug a cold wall instead of their father.

May 29, 2007 Tr. at 31-32. The judge further observed that "[w]hen Wilson murdered Detectives Andrews and Nemorin, he took two police officers from this city, two fathers from their children, two husbands from their wives, two brothers from their siblings, and two sons from their parents." *Id.* at 32. The jury found beyond a reasonable doubt that Wilson's crimes had caused loss, injury, and harm.

I have my doubts whether *Carter v. Kentucky*'s prophylactic rule properly applies in a sentencing proceeding in which the defendant has chosen not to remain silent, but instead to speak. Because the obligation to give a *Carter* instruction arises only "upon request," I have further doubts that it ever arose in this case, given that the instruction actually requested by the defendant would have covered matters about which the defendant had waived his Fifth Amendment rights. That said, I have no doubt about the harmlessness of the alleged Fifth Amendment error on which the majority relies. I conclude without hesitation that neither the prosecutor's three errant words ("has never been") nor the district court's failure to give the modified *Carter* instruction that was never requested, influenced this jury's decision to any degree.

The Supreme Court has said that the severity of a death sentence "mandates careful scrutiny in the review of any colorable claim of error." *Zant v. Stephens*, 462 U.S. at 885. *Chapman*,

19

however, requires at least a "reasonable possibility that the [error] complained of might have contributed to the [result]" before an error warrants reversal. *Chapman v. California*, 386 U.S. 18, 23 (1967) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963) (internal quotation marks omitted). "[N]ot every imperfection in the deliberative process is sufficient, even in a capital case," to set a judgment aside. *Zant*, 462 U.S. at 885. Indeed, if this were not the case, Congress's decision in the Federal Death Penalty Act to give to juries the delicate and difficult decision as to when a capital sentence is justified would be wholly undone.

The jury here heard evidence over the course of eighteen days. This evidence cast a strong light on the defendant: on his crimes, his character, the harms he has caused, and his case in mitigation. The district court noted, in sentencing Wilson, that the jury here "[was] among the most attentive and serious [it] had ever seen," and that the jurors "listened carefully to every argument and the witness testimony, and examined every piece of evidence introduced in this case." Mar. 29, 2007 Tr. at 44.

I conclude that if there was Fifth Amendment error here – and I find it doubtful – such error had no impact on the jury that sentenced Wilson. With regard to the Sixth Amendment, there is simply no error to review. Having reached these conclusions, I believe the death sentences should be affirmed. I respectfully dissent from Parts VI, VII, and VIII of the majority's opinion and from the judgment vacating the death sentences, while joining in the rest of the majority's opinion.